**MONTICELLO TOBACCO CO., Inc., v. AMERICAN TOBACCO CO. et al.**

No. 249, Docket 22333.

United States Court of Appeals
Second Circuit.

Argued May 14, 1952.

Decided June 19, 1952.

See also 12 F.R.D. 344.

630

Philip Handelman, New York City (Walter H. Schulman, New York City, on the brief), for plaintiff-appellant.

Horace G. Hitchcock, New York City (Chadbourne, Parke, Whiteside, Wolff & Brophy and Ralph D. Ray and Melvin D. Goodman, all of New York City, on the brief), for defendants-appellees American Tobacco Co., American · Suppliers, Inc., Paul M. Hahn, and Vincent Riggio.

Bethuel M. Webster, New York City (Webster, Sheffield & Horan and Francis H. Horan and Frederick P. Haas, all of New York City, on the brief), for defendants-appellees Liggett & Myers Tobacco Co., James W. Andrews, and William A. Blount.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit. Judge.

This is an appeal from the dismissal of a private antitrust suit under § 4 of the Clayton Act, 15 U.S.C.A. § 15. Plaintiff, now defunct, was engaged for a short time in 1939 and 1940 in the distribution of tobacco products. Defendants are several of the major cigarette manufacturers and a sprinkling of their officers. The action was commenced by a complaint alleging that defendants, in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, had destroyed plaintiff's business and praying for treble damages in the amount of $36,000,000. Annexed thereto were the information and judgment in a criminal action brought against these same defendants, and others, in the District Court for the Eastern District of Kentucky, also for violation of the Sherman Act. This action, hereinafter referred to as the Lexington action, resulted in a general verdict and conviction, affirmed American Tobacco Co. v. United States, 6 Cir., 147 F. 2d 93, and, on limited review, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575.

At pre-trial hearings in the case at bar it was made amply clear that the basic issue would be the extent to which plaintiff could take advantage of this criminal conviction under § 5 of the Clayton Act, 15 U.S.C.A. § 16. Under that provision such a conviction "shall be prima facie evidence against such defendant in any suit or proceeding brought by any other party against such defendant under said [antitrust] laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto." At the trial herein to the jury, the district judge ruled conditionally at the outset against either its admission as evidence or mention of it in counsel's statements before the jury. During the third week of trial he permitted plaintiff to question certain of the defendants on their conviction. Somewhat later he admitted the judgment for the limited purpose of showing that defendants had conspired to exclude competition by price-fixing, but not that this conspiracy had caused plaintiff's collapse. At the close of plaintiff's case, however, the court concluded that "it would be to the last degree irrational for this jury or any jury to conclude from the evidence here that the distributors' refusal to deal with Monticello was caused by these defendants," and granted defendants' motions to dismiss on the merits. Plaintiff has appealed, assigning as errors the refusal to admit the Lexington judgment unqualifiedly and at the inception of the trial, the exclusion or striking of certain evidence, and the dismissal of the complaint.

Monticello Tobacco Company's moving spirit was one Richard Hartley. Its unhappy history began in 1938 with the issuance of a stock prospectus claiming that Hartley had had substantial experience in the tobacco field. The claims were false. Hartley had made an abortive attempt to market a "Court" cigarette, manufactured for him by American Tobacco Company, during the early thirties; but otherwise there was nothing in his past as to either general business success or initiation into cigarette marketing. Nonetheless, some 16,666 shares of Monticello stock were marketed, resulting in a capital investment of $24,999.

With this, Hartley paid himself $8,300 in advances against his share of net earnings. He also purchased Monticello's inventory of 2,000 cartons of cigarettes and a small amount of pipe tobacco made to order for the company by Christian Peper Tobacco Company. This comprised Monticello's entire stock in trade during its active career; it never manufactured its own cigarettes. It was proposed to market the Monticello cigarette, without substantial advertising, by granting to buyers 5 per cent more discount than established brands offered and, in turn, to suggest an accordingly higher retail price. Hartley, however, was practically his own sales force and his plan met with little success. In the year 1939 he visited some five cigarette jobbers in New York; one placed an order. He also called on several retail stores, some of whom agreed to stock Monticellos; but, as Hartley testified, he did not pursue this outlet, preferring to market through distributors. In 1940 he visited seven jobbers in the Philadelphia-Washington area, but was unable to stimulate any interest, though again some retail concerns agreed to buy. Finally, late in 1940, Hartley sold a few cartons to chain stores in New York as a final gesture. The books of the corporation were closed in June, 1941. By that time, 706 of the 2,000 cartons purchased were unsold. Some scant sales of $511.83 had been recorded, it is true. But we cannot conclude from the record of the corporation that any sustained management effort was made to market Monticellos on a continuing or permanent basis.

■ Plaintiff nonetheless alleges that the recalcitrance of wholesale dealers to accept its product was not the result of economic considerations, as at least one suggested at the trial; rather it is its contention that the defendants, in furtherance of the conspiracy for which they were indicted and convicted at Lexington, forced its exclusion from the competitive market. The trial court dismissed the claim. Needless to say, this was justified unless plaintiff could show some connection between Monticello's failure and defendants' proven conspiracy; the mere fact of conviction cannot make the major tobacco manufacturers liable for every business casualty in the cigarette field.

■ To show this essential element, however, plaintiff was forced to rely on the Lexington judgment, for none of the jobbers who testified admitted to pressure by defendants. As the statute, quoted above, shows, the effect of such a judgment for purposes of a treble-damage suit is limited to "matters respecting which said judgment or decree would be an estoppel as between the parties thereto." Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534, has recently interpreted this to mean that private suitors may avail themselves of the results of a criminal antitrust case only in regard to facts "necessarily" adjudicated. Whatever the defendants would normally be collaterally estopped to deny is thus established prima facie by the admission of a previous criminal conviction. See Fifth and Walnut, Inc., v. Loew's Incorporated, 2 Cir., 176 F.2d 587, 593, certiorari denied 338 U.S. 894, 70 S.Ct. 242, 94 L.Ed. 549; Frost v. Bankers Commercial Corp., 2 Cir., 194 F.2d 505, 507; Scott, Collateral Estoppel by Judgment, 56 Harv. L.Rev. 1; Restatement, Judgments § 68, 1942; Note, 61 Yale L.J. 417, 420 n. 15. But whatever is crucial to the treble-damage case and is not distinctly determined in the previous government suit must be proven by direct evidence. Dipson Theatres v. Buffalo Theatres, 2 Cir., 190 F.2d

951, 958, certiorari denied 342 U.S. 926, 72 S.Ct. 363. Section 5 does not permit a haphazard use of a criminal judgment merely for its aura of guilt, or "to imply new wrongdoing from past wrongdoing." Hastie, C. J., dissenting in Milgram v. Loew's, Inc., 3 Cir., 192 F.2d 579, 595. See also Note, 65 Harv.L.Rev. 1400, 1404–1407.

To determine just how much the Lexington judgment proves for plaintiff requires examination, initially by the trial court and later on appeal, of the pleadings, testimony, charge, and court opinions. Emich Motors Corp. v. General Motors Corp., supra, 340 U.S. 558, 569, 71 S.Ct. 408, 95 L.Ed. 534. While we do not have a complete record of the evidence adduced, the issues which the general verdict may be said to have adjudicated are sufficiently defined for our purposes by the information and the court's charge to the jury, as well as the Supreme Court's opinion. American Tobacco Co. v. United States, supra. Though the prosecution generally and broadly alleged conspiracy in restraint of trade and conspiracy, attempt toward, and actual, monopolization, the Lexington trial crystallized these into a quite specific form of economic pressure. Five effectuating practices were isolated. Two of these, the control of marketing conditions and price leadership in the leaf tobacco market—to which, incidentally, the bulk of the evidence was directed—clearly had no impact on plaintiff. It had at all times ready access to cigarettes. Two others, factory and resale price fixing, likewise could not affect it. Hence if plaintiff is to. obtain any comfort from the Lexington judgment, it must be from the general allegation of dealer domination through maintenance of a "distributive mechanism favorable to their products." But as the evidence developed, this meant merely identical retail prices at a figure not more than three cents above competing lower priced brands. The uniformity and competitive differential in price was obtained by similar discounts for each defendant's cigarettes and lower, "direct list" prices for those dealers observing the differential requirement. American Tobacco Co. v. United States, supra, 328 U.S. 781, 804–808, 66 S.Ct. 1125. Nowhere

was there evidence that defendants dictated what other brands these retailers could stock and sell.

Comparing this case, then, to the Emich situation, it is plain to see why plaintiff must lose while Emich prevailed. Emich was an automobile distributor who had set up his own finance company. A prior government suit, in which he had testified against General Motors, had established the latter's policy of restricting its financing of its automobiles to its own finance company subsidiary, GMAC. It also showed General Motors' coercive practices employed to effectuate this policy in revoking franchises of dealers who insisted on using their own finance companies. United States v. General Motors Corp., 7 Cir., 121 F.2d 376, certiorari denied General Motors Corp. v. United States, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497. The effect generally of such action on a dealer like Emich was foregone; choked off from the supply of his product, he had nothing to sell. Hence Emich, in his own treble-damage case, needed only to direct his evidence toward the question of whether or not the cancellation of his own franchise had been effected in pursuance of this plan. Emich Motors Corp. v. General Motors Corp., supra, 340 U.S. 558, 571, 71 S.Ct. 408, 95 L.Ed. 534.

In the case at bar, however, plaintiff was instead a competing manufacturer. It was not injured by the monopoly charged in the source of supply, for it never sought to purchase or own leaf tobacco. Hence, to prevail, it was required to show some manifestation of defendants' conspiracy in the selling market. But there was nothing in the Lexington case indicating that the conspiracy was effectuated even there in a way that might generally have affected plaintiff. Price pressure alone, and not coercion of wholesalers to stock only certain brands, was proven. Price identity on the distribution level could not have affected plaintiff. Fifth and Walnut, Inc. v. Loew's Incorporated, supra, 2 Cir., 176 F.2d 587, 590. Hence the jury verdict in the Lexington case cannot be said to be "firmly rooted in a finding of coercive conduct on the part of respondents"—Emich Motors Corp.

v. General Motors Corp., supra, 340 U.S. 558, 570, 71 S.Ct. 408, 414—which made impossible the marketing of plaintiff's non-competing higher priced cigarettes. The trial court was quite correct in defining the prima facie effect of the criminal conviction as showing only a previous concert or collusion among the defendants, and not of relevant effectuating practices. Not only did it not establish that Monticello in particular was injured by the conspiracy; it did not even prove that it could have been, by any of the methods used to carry out the conspiracy adduced at Lexington. Absent a showing of causal connection between the collusion and jobbers' refusals to handle plaintiff's product, dismissal was mandatory. United States v. Sherman, 2 Cir., 171 F.2d 619, certiorari denied Grimaldi v. United States, 337 U.S. 931, 69 S. Ct. 1484, 93 L.Ed. 1738; Brayer v. John Hancock Mut. Life Ins. Co., 2 Cir., 179 F.2d 925; Industrial Bankers Securities Corp. v. Higgins, 2 Cir., 104 F.2d 177.

The other claimed errors do not require extended discussion. The testimony at Lexington of certain employees of the defendants there was properly excluded as hearsay, and not binding on their employers. Goetz v. Bank of Kansas City, 119 U.S. 551, 7 S.Ct. 318, 30 L.Ed. 515. How plaintiff was injured by the trial judge's refusal to admit the Lexington judgment at the outset of the trial is not overly clear. Nonetheless, it was certainly within his discretion to control the order of proof, Emich Motors Corp. v. General Motors Corp., supra—a discretion to be carefully exercised in regard to evidence of such slight probative value, but potentially high emotive impact on a jury of laymen. United States v. Schenck, 2 Cir., 126 F.2d 702, 709, certiorari denied Moskowitz v. United States, 316 U.S. 705, 62 S.Ct. 1309, 86 L.Ed. 1773; United States v. Hirsch, 2 Cir., 74 F.2d 215, 219, certiorari denied Hirsch v. United States, 295 U.S. 739, 55 S.Ct. 653, 79 L.Ed. 1686; United States v. Perillo, 2 Cir., 164 F.2d 645, 646. Plaintiff, of course, cannot question the court's power to examine and explain the judgment to the jury. Emich Motors Corp. v. General Motors Corp.,

supra. And the errors claimed as to the content of these limiting instructions, as well as the exclusion of evidential speculation on damages, we think academic in view of our affirmance of the dismissal.

Affirmed.