**DART DRUG CORPORATION et al.,**
**Appellants,**

**v.**

**PARKE, DAVIS & COMPANY, Appellee.**

**No. 18268.**

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 16, 1964.

Decided Feb. 11, 1965.

Mr. Robert B. Hirsch, Washington, D. C., for appellants.

Mr. Roberts B. Owen, Washington, D. C., for appellee.

Before PRETTYMAN, Senior Circuit Judge, and WRIGHT and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

In an action for treble damages premised upon conduct assertedly violative of Sections 1 and 3 of the Sherman Act,[1]

---

1. 15 U.S.C. §§ 1, 3. Section 3 is, in terms of the substantive offense defined therein, an exact counterpart of Section 1, made expressly applicable to the Territories and the District of Columbia. For convenience hereinafter reference will be made only to Section 1.

the plaintiff below appeals from an order of the District Court denying its motion for summary judgment and granting that of the defendant. Our appellate scrutiny of an action of this kind ordinarily looks only to its immediate setting, but our appraisal of its propriety here has been in the light of both the representations made to the District Court by the parties in support of their respective motions, and the arguments made on appeal by new counsel for appellant. So viewed, we are of the opinion that the ruling was fully justified, and we sustain it.

## I

The proceedings in the District Court on the cross-motions for summary judgment are intelligible only by reference to the unfolding of an antitrust incident involving important litigation between the appellee drug manufacturer (Parke, Davis) and the Government. The appel-

lant drug retailer (Dart) had, like other drug retailers and wholesalers in the metropolitan area of Washington, a role in the events giving rise to that litigation. Those events are described in detail in the Supreme Court's opinion in United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). It is enough for our purposes to note that they constituted throughout July and August of 1956 a collaboration and concert of action between Parke, Davis and its customers, directed towards resale price maintenance and of such a nature as to cause the Supreme Court to find Parke, Davis in violation of Section 1 of the Sherman Act.

In its opinion, the Supreme Court not only identified with some specificity the forbidden collaborative activities, but also characterized them as having begun in July, and ended in September, 1956.[2]

2. The Court's opinion described what happened at length. The following excerpts from it give an essential picture of what was done, and when (362 U.S. at 33–36, 80 S.Ct. at 506–508):

"Thereafter in July [1956] the branch manager put into effect a program for promoting observance of the suggested minimum retail prices by the retailers involved. The program contemplated the participation of the five drug wholesalers. In order to insure that retailers who did not comply would be cut off from sources of supply, representatives of Parke Davis visited the wholesalers and told them, in effect, that not only would Parke Davis refuse to sell to wholesalers who did not adhere to the policy announced in its catalogue, but also that it would refuse to sell to wholesalers who sold Parke Davis products to retailers who did not observe the suggested minimum retail prices. Each wholesaler was interviewed individually but each was also informed that his competitors were also being apprised of this. The wholesalers without exception indicated a willingness to go along.

"Representatives called contemporaneously upon the retailers involved, individually, and told each that if he did not observe the suggested minimum retail prices, Parke Davis would refuse to deal with him, and that furthermore he would be unable to purchase any Parke Davis products from the whole-

salers. Each of the retailers was also told that his competitors were being similarly informed.

"Several retailers refused to give any assurances of compliance and continued after these July interviews to advertise and sell Parke Davis products at prices below the suggested minimum retail prices. Their names were furnished by Parke Davis to the wholesalers. Thereafter Parke Davis refused to fill direct orders from such retailers and the wholesalers likewise refused to fill their orders. * * *

\*　　\*　　\*　　\*　　\*

"But five retailers continued selling Parke Davis products at less than the suggested minimum prices from stocks on hand. Within a few weeks Parke Davis modified its program. Its officials believed that the selling at discount prices would be deterred, and the effects minimized of any isolated instances of discount selling which might continue, if all advertising of such prices were discontinued. In August the Parke Davis representatives again called on the retailers individually. When interviewed, the president of Dart Drug Company indicated that he might be willing to stop advertising, although continuing to sell at discount prices, if shipments to him were resumed. Each of the other retailers was then told individually by Parke Davis representatives that Dart was ready to discontinue advertising. Each

The Court said that at least one reason for the termination of these illegal activities was the fact that "the Department of Justice, on complaint of Dart Drug Company, had begun an investigation of possible violation of the antitrust laws." 362 U.S. at 36, 80 S.Ct. at 508. This investigation culminated, in May of 1957, in the institution by the Government of both criminal and civil proceedings against Parke, Davis, asserting violations of Section 1 of the Sherman Act. The criminal case ended in November, 1957, with a judgment of acquittal. The civil case has had both a longer life and a different result. Because of the asserted relationship between it and the issues before us, the course of that litigation needs to be recounted in some detail.

The trial of the case in the District Court, sitting without a jury because the relief sought was injunctive in nature, initially terminated in July of 1958 in a judgment for Parke, Davis at the close of the Government's evidence. Findings of fact and conclusions of law were entered by the trial judge, United States v. Parke, Davis & Co., 164 F.Supp. 827, 834 (D.D.C.1958), at least two of the former of which are of present interest. The first is as follows, and suggests on its face the origins of the present litigation:

> "26. On December 12, 1957, subsequent to the trial of the companion criminal action, Parke, Davis informed Dart Drug Company that it was permanently closing the Dart account and did not intend to have any further dealings with that company. Since that time, Parke, Davis has not sold its products to Dart Drug. There is no evidence, however, that Parke, Davis made any effort to influence the dealings of Dart Drug with the wholesalers, and Dart Drug has continued to purchase Parke, Davis' products from wholesalers in the District of Columbia and to sell and advertise such products at cut prices. Parke, Davis' action in ceasing relations with Dart was a purely unilateral one, and there is no evidence that it had any relation to Dart's prices or advertising policies."

The second relates both to the time when the assertedly illegal activity ended and the need for explicit restraints upon its resumption:

> "27. In the fall of 1956, Parke, Davis in good faith abandoned and discontinued its efforts to maintain minimum resale prices in the District of Columbia and Virginia through refusals to sell. Since the fall of 1956, and up until the present time, retailers in both areas, including retailers alleged to be co-conspirators, have continuously sold and advertised Parke, Davis products at cut prices, and have been able to obtain those products from both the wholesalers and/or Parke, Davis itself. Parke, Davis has made no effort to compel the cessation of these practices. There is no proof or indication of any intention on the part of Parke, Davis to resume such efforts. There is no present threat

thereupon said that if Dart stopped advertising he would also. On August 28 Parke Davis reported this reaction to Dart. Thereafter all of the retailers discontinued advertising of Parke Davis vitamins at less than suggested minimum retail prices and Parke Davis and the wholesalers resumed sales of Parke Davis products to them. However, the suspension of advertising lasted only a month. One of the retailers again started newspaper advertising in September and, despite efforts of Parke Davis to prevent it, the others quickly followed suit. Parke Davis then

stopped trying to promote the retailers' adherence to its suggested resale prices, and neither it nor the wholesalers have since declined further dealings with them.[5] * * *

"[5]. Except that in December 1957, Parke Davis informed Dart Drug Company that it did not intend to have ay further dealing with Dart. The latter has, however, continued to purchase Parke Davis products from wholesalers. Thus, Dart Drug cannot receive the volume discount on large quantity purchases."

or substantial probability or likelihood that Parke, Davis will attempt, in the District of Columbia or Virginia, to cut off retailers who fail to sell its products at its suggested minimum resale prices, or to cut off wholesalers because they in turn sell to such retailers. Nor is there any threat or substantial probability or likelihood that Parke, Davis will contract, combine or conspire with others to fix or maintain prices or terms or conditions of sale for its products in the District of Columbia and Virginia."

The Government did not acquiesce in the trial court's conclusions with respect to the innocence of the program effectuated by Parke, Davis and its customers in the summer of 1956, nor as to the demonstrated lack of need, even assuming the illegality of that program, of an injunction against its future reinstatement. It challenged these propositions in the Supreme Court, but it did not attack Finding No. 26 nor so much of Finding No. 27 as related to the ending of the illegal collaboration in 1956. Nor did the Supreme Court, *sua sponte*, question these findings, although its opinion fully reflected its awareness of the 1957 refusal to deal with Dart. See note 2 *supra*.

The Supreme Court did embrace the Government's position on the alleged clash between the commands of Section 1 of the Sherman Act and the efforts of Parke, Davis, in collaboration with its customers, to enforce resale price maintenance in the summer of 1956. It rejected the contention that Parke, Davis had acted unilaterally and wholly without reference to the cooperation, connivance, or participation of others—without, in short, any element of the combination, conspiracy or agreement proscribed by Section 1. It held, contrarily, that this element was present in 1956 by reason of the concert of purpose and action which obtained between Parke, Davis and its customers, including Dart, in the creation and effectuation of a program of resale price maintenance.

The District Court's alternative ground of judgment was similarly unacceptable to the Supreme Court. The latter did not believe that the evidence supported the trial court's finding that "the compelling reason for defendant's so doing [ceasing its efforts] was forced upon it by business and economic conditions in its field." 164 F.Supp. at 830. The Supreme Court inclined rather to the belief that the program had been abandoned at the summer's end in 1956 because of the antitrust investigation launched by the Government; and it not unnaturally regarded this as a slender support for a judgment that injunctive relief was neither necessary nor appropriate. It reversed and remanded with directions to issue an injunction "unless the company elects to submit evidence in defense and refutes the Government's right to injunctive relief established by the present record."

Parke, Davis did so elect, although not for the purpose of defending on the merits as to the illegal combination alleged to have existed in 1956. Instead, at a trial resumed in June of 1960, it introduced evidence to prove that the program found unlawful had in truth ended completely in 1956 and that, in consequence, the entry of an injunction in 1960 speaking to the future was not in keeping either with the requirements of the statute or of sound equity jurisprudence. The Government chose to submit no further evidence and, on July 18, 1960, the trial judge made further (and, as he termed them, "supplementary") findings of fact, from which he drew the legal conclusion that the injunctive relief sought by the Government would be "unnecessary and inappropriate" and should, accordingly, be denied. The findings of fact are to the effect that the illegal activities took place in July and August, 1956, directly after which Parke, Davis concluded that, for economic and commercial considerations, efforts at resale price maintenance were not in Parke, Davis' interest; and that, certainly by January, 1957, this change of policy had been fully adopted and disseminated

throughout the company, and was adhered to thereafter.

The Government once more went to the Supreme Court, not, however, to attack what the trial court had done on remand, namely, the denial of an injunction, but what it had failed to do, i. e., to enter a judgment that Parke, Davis had violated Section 1. The Government took no objection to any of the supplemental findings of fact, nor did it appeal from the denial of an injunction. It did insist that it was entitled to a judgment on the merits. The Supreme Court agreed,[3] and directed that such a judgment be entered. It also held that "the District Court should retain the case on the docket for future action in the event the Government applies for further relief from an alleged resumption by Parke Davis of illegal activity." The use by the Court of the word "resumption" in this context appears not without significance; and, in any event, it does not appear from the record before us that any such application has yet been made.

## II

With the apparent ending in 1956 of the collaborative effort at resale price maintenance, Dart seems for some time thereafter to have been treated no differently by Parke, Davis from any of its other customers, that is to say, it was free to, and did, purchase Parke, Davis products directly from Parke, Davis, or from wholesalers of such products, without any suggestion or pressure with respect to its resale prices. On December 12, 1957, however, Dart was formally notified by Parke, Davis that the latter did "not wish to have any further business relations with" Dart, and that its account was being closed permanently. This meant that Dart could no longer buy directly from Parke, Davis, although it could, and did, continue to obtain Parke, Davis products from wholesalers. The products so obtained Dart could, and did, resell to the public at such prices as it chose.

On January 11, 1962, Dart filed this treble damage action against Parke, Davis, alleging Parke, Davis' refusal to sell to it directly, as well as a subsequent change in distribution practices by Parke, Davis whereby the latter sold its large package sized goods only to direct accounts, thereby disabling Dart from obtaining such packages from wholesalers. These acts by Parke, Davis were alleged to be pursuant to a combination and conspiracy in violation of Section 1 of the Sherman Act, with resulting monetary damage to Dart by reason of merchandise shortages and higher costs due to (1) the wholesalers' margins and (2) the unavailability of the larger sized packages. Certain wholesalers and retailers were named as co-conspirators, although not as defendants. A section of the complaint entitled "Background of the Offense" described the civil action brought by the Government against Parke, Davis; and a copy of the final judgment in this suit, entered by the District Court at the direction of the Supreme Court and adjudging Parke, Davis to have violated Section 1 by reason of the 1956 program, was annexed to the complaint as an exhibit. Under the caption "Offense Alleged," the complaint asserted that, commencing in 1956 and continuing to the date of filing, Parke, Davis "has entered into and maintained a combination and conspiracy in restraint of interstate trade and commerce" in violation of Section 1. This "restraint of trade" was said to have "consisted of a series of acts, a plan of action and an understanding and concert of action among Parke, Davis and certain wholesaler and retailer customers of Parke, Davis," designed to maintain resale prices and to deny Parke, Davis products to retailers who do not adhere to such prices.

Parke, Davis filed an answer admitting the refusal to sell directly to Dart, and the change in distribution practices. It denied, however, that these resulted from any combination or conspiracy, or that

---

3. United States v. Parke, Davis & Co., 365 U.S. 125, 81 S.Ct. 433, 5 L.Ed.2d 457 (1961).

there existed any combination or conspiracy as alleged in the complaint.

As it was permitted to do under Fed. R.Civ.P. 33, Parke, Davis propounded a number of written interrogatories to Dart. These interrogatories, and the answers given by Dart, were part of the record before the District Court when it ruled on the cross-motions for summary judgment, and they contain material highly relevant to that ruling. For example, with respect to the allegation in the complaint that the 1961 change in distribution practices was a "result of the unlawful combination and conspiracy" otherwise alleged in the complaint, Dart was asked to state whether it claimed that such change was unlawful, and, if so, whether such illegality resulted from an unlawful agreement entered into by Parke, Davis to make such change. The last branch of this interrogatory called upon Dart, if it relied upon such an agreement, to identify its date, the parties to it, all persons with knowledge of it, and all documents comprising, or relating to, it. Dart's complete answer to these particular inquiries is as follows:

"*Plaintiffs make no contention as to whether the 1961 distribution change was legal or illegal. The purpose of the allegation of this complaint concerning the 1961 distribution change runs to the issue of damages.* Since the plaintiffs were unable to purchase direct by reason of the 1957 cut off, the 1961 distribution change resulted in their not being able to purchase the large package sized goods. Coupled with the 1957 cut off, the 1961 distribution change has forced the plaintiffs to pay higher prices for Parke, Davis products and has also had the effect of keeping plaintiffs from obtaining sufficient of these products to meet the demands of their business." (Emphasis supplied.)

This answer is, to say the least, hardly in keeping with the allegations made in the complaint with respect to the 1961 distribution change. It strongly suggests what is otherwise reflected in other answers by Dart to interrogatories, namely, that Dart's claim of unlawful conduct by Parke, Davis is essentially, if not exclusively, directed to the December 12, 1957, discontinuance of business relations with Dart as a direct purchaser of Parke, Davis products.

The first interrogatory addressed to Dart asked the same three questions in respect of the 1957 cut-off, that is to say was the cut-off claimed to be unlawful, was that illegality claimed to be the result of an agreement, and if so, what, and with whom, was the agreement? Dart's answer to the first of these queries was submitted as responsive to all. It was:

"Yes. An unlawful combination and conspiracy by Parke, Davis & Company against Dart Drug was found to have existed in Civil Action No. 1064 '57, United States of America, plaintiff v. Parke, Davis & Company, defendant. It is the plaintiff's contention herein that the 1957 cut off of Dart was a direct result of the combination and conspiracy found to be unlawful in Civil Action No. 1064 '57. If it had not been for that unlawful combination and conspiracy, Dart would not have been cut off. There was a criminal antitrust suit against Parke, Davis, United States of America v. Parke, Davis & Company, CR. No. 444–57, which resulted in an acquittal of Parke, Davis on November 5, 1957. Herbert H. Haft, President of Dart, testified for the U. S. against Parke, Davis in that case. After the defendant had won the criminal case Dart was cut off, which plaintiffs assert was a direct result of testimony given by Mr. Haft at the criminal trial."

Parke, Davis did not agree as to the adequacy of this response to the second and third items of this interrogatory, and it moved to compel answers. Dart, in response to this motion, filed the following, which it characterized as an additional answer to the second query

as to whether the asserted illegality resulted from an agreement:

"Plaintiffs claim that the 1957 cut off was the direct result of the combination and conspiracy found to be illegal by this Court. In other words, plaintiffs contend that if it had not been for the unlawful combination and conspiracy engaged in by defendant, plaintiffs would not have been cut off in 1957 by the defendant. The United States Government in 1956 filed both criminal and civil cases against the defendant charging it with engaging in an unlawful combination and conspiracy to maintain resale prices. The criminal case was tried first, the trial having taken place during November 1957. At this trial, Herbert Haft, President of the Dart Drug chain, was the Government's principal witness. At the conclusion of the Government's evidence the trial court directed a verdict of acquittal in favor of the defendant. Shortly thereafter Herbert Haft was notified by Parke, Davis that that company did not wish to have any further business relations with Dart Drug. After this cut off, counsel for the Government filed an affidavit with the Court urging that the defendant was punishing Mr. Haft for his testimony in the criminal case and asking the Court to expedite the trial of the civil case. In response to this affidavit the defendant advised the Court that the cut off was the result of several things, including the fact that the statements made by Mr. Haft on the stand did not agree with the views of the Parke, Davis employees involved in this situation.

"The civil case went to trial in June of 1958 and once again the trial court dismissed the action after the Government had presented its case. The Government appealed to the Supreme Court and in February 1960 the Supreme Court reversed the District Court and remanded the case. In its opinion, the Supreme Court specifically refers to the illegal action taken against Dart Drug. Furthermore, the judgment against the defendant finally entered by this Court also refers specifically to the illegal actions against Dart Drug. The plaintiffs' claim is based on these illegal actions and upon the fact that the 1957 cut off was a direct effect of these illegal actions. *Plaintiffs have no present knowledge of whether defendant made agreements with third parties to undertake the 1957 cut off.* Plaintiffs reassert that the 1957 cut off was the direct result of defendant's illegal activities." (Emphasis supplied.)

Parke, Davis propounded several interrogatories with respect to the allegations in the complaint that there had been a continuing combination and conspiracy from 1956 down to the date of filing the complaint. It asked for specification of acts performed or communications made in pursuance of any such conspiracy between December 31, 1956 and the filing of the complaint, with identification of dates, actors, and documents. Dart's answer was as follows:

"The plaintiffs' claims in this case are based upon the combination and conspiracy entered into by the defendant which has already been declared illegal by this Court. The conduct of the defendant on which the plaintiffs' claims are based is the same conduct which formed the basis of the United States Government's suit against the defendant which has been described in the answer to Interrogatory I–B. *Plaintiffs have no present knowledge whether defendant has engaged in illegal conduct other than that described in the answer to Interrogatory I–B.* Defendant's statements seem to indicate that it is seeking to change the nature of this suit. Plaintiffs reassert that their claims are based on defendant's actions which have already been adjudged

illegal by this court, which illegal actions have damaged plaintiff's business." (Emphasis supplied.)

With the record in this state, both parties filed motions for summary judgment. When these motions for argument came on in open court, counsel for Parke, Davis informed the court that he and Dart's counsel appeared to be in agreement that the litigation presented no disputed issues of fact but only a pure question of law, namely, was the 1957 cut-off of Dart by Parke, Davis, even though motivated by a disrelish for Dart's discount sales of Parke, Davis products, a violation of Section 1 of the Sherman Act? Dart's counsel readily agreed that, as he put it, "This is the issue in this case. * * *" His references to the litigation between the Government and Parke, Davis, and to the fact that his case rested upon his claim that the 1957 cut-off resulted from the 1956 conspiracy, puzzled the court as to why there were not issues of fact to be tried.[4] Dart's counsel, however,

---

4. The transcript of the oral argument has to be read in its entirety in order to understand the angle of vision from which the District Court became entitled to view it. The following excerpts, although lengthy, are minimally necessary to convey the flavor of the position pressed upon the court:

"THE COURT: But do you agree with Mr. Owen that there is only a question of law involved? The way you are presenting this case there may be a question of fact. Mr. Owen presents it as a question of law. Now do you agree with Mr. Owen that it is only a question of law?

"MR. CROWLEY: Yes, I do, Your Honor.

"THE COURT: Then what is the question of law according to your view?

"You know, when counsel takes the position there is only a question of law involved, you have got to be able to state that question succinctly and briefly and you have to crystallize it.

"Now what is the question of law?

"MR. CROWLEY: The question is that the 1957 cut-off and the 1961 distribution change were the proximate result of the illegal violations of the Sherman Act in 1956.

"THE COURT: Well, that is a question of fact.

"MR. CROWLEY: And these naturally flow. And I am prepared to demonstrate that this is a question of law.

"THE COURT: Then what is the question of law? You have to state it as a question of law, Mr. Crowley.

"MR. CROWLEY: That the violation of the Sherman Act—that this '57 cut-off is a direct result of the 1956 violation of the Sherman Act; it continued, the thread flows.

"THE COURT: That is a question of fact. If something you say is a direct result of something else, that is a factual question, isn't it?

"MR. CROWLEY: But the facts have already been established in this record, Your Honor. The record has already established these facts. The Supreme Court's opinion and the final judgment of the District Court and the—

"THE COURT: Well, proceed in your own way. You say the facts have been established. Very well, is there any finding of fact that the 1957 cut-off letter is the direct result of the 1956 conduct?

"MR. CROWLEY: No, there is not.

"THE COURT: You say the facts have been established, but you seek to have this Court draw an inference of fact, don't you?

"MR. CROWLEY: Yes, I think so.

"THE COURT: Then that becomes a question of fact in and of itself. Well, you may proceed, Mr. Crowley.

"MR. CROWLEY: I think it is important, because of the narrowness of the facts, to check the chronology; statements made of interpretations of chronological developments make this necessary. The truth is that until late August 1956 the combination existed and Parke Davis—

"THE COURT: I must say I still don't understand what the question of law is according to your view. Whether one event or action is the result of some prior event or action is a question of fact and not of law.

"MR. CROWLEY: It is my position, Your Honor, that these are not a separate—there is no real separation of these events, that they are one flowing—

"THE COURT: I understand, but if I agree with you, then I think the case should be tried. Much depends upon circumstances. I can't determine as a question of law that there is no separation.

"Now, I suppose I could hold as a matter of law that it is immaterial

stoutly resisted this inclination on the part of the court for the reason that, in his words, "My opinion was that the facts, the facts upon which this question [of law] must be resolved are in this record." In any event, the eventual —and critical—exchange between the court and Dart's counsel was this:

"THE COURT: Now I want to know this: do you claim—and this is important—do you claim that there was any concerted action in 1957 between Parke Davis and the wholesalers as against Dart?

"MR. CROWLEY: No.

"THE COURT: You do not?

"MR. CROWLEY: We do not.

"THE COURT: Very well. Thank you."

In its memorandum opinion disposing of the cross-motions, the court reported —accurately, in our estimation—the representation made to it by Dart as to the nature of its claim:

"The Court inquired of counsel for the plaintiff whether there was any claim here that there was any concerted action subsequent to December 12th, 1957 or in conjunction with the action of that date. With commendable candor plaintiff's counsel answered in the negative."

It went on to hold in substance that there can be no violation of Section 1 by unilateral conduct wholly devoid of any element of combination, conspiracy, and agreement; and that the subsequent existence of such an element cannot be inferred as a matter of law from the fact that it has been found to have been in existence for a determinate period of time on an earlier occasion. As noted at the outset, we cannot say that, on the record before him and in the light of

counsel's presumably considered representations in open court, the trial judge erred in his dispositions of the cross-motions.

### III

█ It seems clear that, however misconceived it may have been, Dart's counsel below had a theory of his case which was firmly and consciously entertained and with which his representations to the court were fully consistent. It was that, since Parke, Davis had been found to be guilty of conspiratorial conduct in 1956 aimed at maintenance of resale prices of its products, any subsequent act by Parke, Davis having the same motivation must be deemed to partake of the prior illegality. In his view—and quite accurately—there were no issues of fact as to Parke, Davis' collaborative derelictions in 1956, or as to the community of motivation between those activities and the 1957 refusal to sell directly to Dart. Since Parke, Davis freely conceded these matters, there were, in his submission, no factual questions to be tried, and Dart was entitled to summary judgment on the merits of its claim that Parke, Davis had violated Section 1 of the Sherman Act. If he was right in these assumptions, it was perfectly logical for him to have responded as he did to Parke, Davis' interrogatories, and to have represented to the court that he made no claim of any collaborative activity by Parke, Davis in connection with the 1957 cut-off. If he was wrong, it was equally logical for the court to have concluded that there was no occasion to hold the case for trial of the issue of whether Parke, Davis had, as alleged, violated Section 1. For surely authority need not be cited for the proposition that Section 1, unlike Section 2 and certain other antitrust statutes,

whether there is a separation or not, but if it is material whether there is a continuity, then that is a question of fact.

"Well, I will let you present your matter in your own way. You may go ahead.

"MR. CROWLEY: In September of 1956 Parke Davis discontinued its

activities of causing the wholesalers not to sell. We will just summarize that by saying they discontinued the activity which was subsequently determined to be illegal in the form of a combination."

reaches only those situations involving a collaborative element in the form of a contract, combination, or conspiracy. Where that element is expressly disclaimed by one invoking Section 1, he should not feel surprised, nor should he be permitted to complain, if he finds himself out of court before trial.

Before us Dart is represented by new counsel who, although having noticed an appeal from both facets of the District Court's order (*i. e.*, denying Dart's motion for summary judgment and granting Parke, Davis'), asks us in brief and argument only to reverse the latter. Parke, Davis urges upon us with some force that Dart should not be allowed to have it both ways, that is to say, to present its case on one theory to the District Court and then, through new counsel, to seek reversal by taking a new tack before us. We agree that a decent respect for the principle of orderliness in litigation, quite apart from the deference due a District Judge who labored mightily to guide counsel away from the pitfalls of his own position, should make us slow to find reversible error by reason of new and different contentions made here for the first time. But caution is not the same as immobility where justice is involved, and we are confident we have the unreserved concurrence of the District Judge in turning to an examination on their merits of the points which counsel now says should have been made before. Our difficulty from Dart's standpoint is that, once examined, the theory advanced on appeal is not, in reality, significantly different from that followed in the District Court, certainly not so strikingly so as to cause us to feel that reversal is the only course compatible with justice.

For counsel does not now tell us that the presentation below was simply misconceived insofar as Dart was concerned and misleading with respect to the court. Neither does he tell us that, if we will only erase the error into which the court was decoyed by his predecessor and let him get to trial on the merits, he will be prepared to prove by evidence that the 1957 cut-off resulted from collaborative activities violative of Section 1, contemporaneously carried on by Parke, Davis, either as an unbroken continuation of the 1956 conspiracy, or as a resumption of it, or as a fresh conspiracy initiated in 1957. Contrarily, the attractions of an overly-expansive reading of Section 5 of the Clayton Act seem to have continued to weave their spell.

Counsel's first effort here is to persuade us that counsel below really did not quite mean what he said. One of the extraordinary by-products of this effort is the flat statement in one part of the brief that "Dart has never contended that a fresh conspiracy was formed in 1957," whereas elsewhere it is stated that the grant of summary judgment was improper unless the only reasonable inference from the facts of record is that "no fresh conspiracy was entered into in 1957 which existed at the time of the refusal to deal." Another interesting speculation aired by counsel in this regard is that his predecessor could not have thought that "concerted action" as used by the District Judge meant anything like the "concert of action" alleged in the complaint as having obtained between Parke, Davis and its customers and as having thereby constituted the asserted restraint of trade violative of Section 1.

We are not, accordingly, impressed with the gloss which is now sought to be given the representations made on behalf of Dart to the District Court. Our more immediate interest, however, is in the representations made to us as requiring reversal. It is here that, as said above, we find a much narrower gulf between the new and the old than might have been supposed to be the case.

The root of this resemblance is in the continuing preoccupation of Dart with the record compiled in the Government's civil proceeding. The primary argument made to us is that from the facts presently in the record—not facts which might be proved of record if we remanded the case for trial—it must be "presumed that the conspiracy condemn-

ed by the Supreme Court * * * was still in existence at the time Dart was cut off by Parke, Davis for the second time." Alternatively to the vocabulary of presumptions, it appears to be urged upon us that, by reason of the presence in this record of the judgment against Parke, Davis in the civil case, the trier of fact could, without more, infer that the 1957 cut-off was in furtherance of a contemporaneous conspiracy.

In neither aspect is this contention acceptable. The judgment in the civil case establishes that Parke, Davis violated Section 1 of the Sherman Act by engaging in collaborative activity in 1956.[5] There are unimpeached findings in that case that this unlawful activity began and ended in 1956. The judgment in that case is, under the statute, admissible in this as *prima facie* evidence as to all matters respecting which that judgment would be an estoppel as between the parties to it. This means, for example, that Parke, Davis could not effectively deny in this suit that it violated the law in 1956. It does not mean that Dart may now say in this suit that Parke, Davis is either presumed to have violated the law in 1957 or that a jury may, without any evidence before it other than the judgment, infer a 1957 violation.

That this is the law of this circuit is evidenced by Orbo Theatre Corp. v. Loew's, Inc., 156 F.Supp. 770 (D.D.C. 1957), aff'd *per curiam*, 104 U.S.App.

D.C. 262, 261 F.2d 380 (D.C.Cir.1958), cert. denied, 359 U.S. 943, 79 S.Ct. 725, 3 L.Ed.2d 677 (1959). We there affirmed the action of the District Court in denying probative value, on the issue of whether there was a conspiracy in 1955, to judgments in Government litigation establishing a conspiracy in 1950. The District Court correctly stated that (156 F.Supp. at 776–77):

"Such a decree * * * is prima facie evidence only as to matters actually determined and does not extend to all issues that might have been adjudicated. * * * the decree is prima facie evidence only of a conspiracy covering the same area and existing during the same time as that involved in the case on trial."

The Second Circuit has also recognized this principle. In the context of a claim that a judgment finding a conspiracy in 1945 constituted *prima facie* proof of a conspiracy in 1946, that court said: "In determining, under that section [Section 5(a) of the Clayton Act], the effect of a judgment in a prior anti-trust suit it is not our function to consider inferences, whether reasonable ones or not, that might be drawn from the language of the prior judgment. Under section 5 a judgment in a prior suit is *prima facie* evidence 'as to all matters respecting which said judgment * * would be an *estoppel as between*

5. The key sentence in this judgment, which was entered on April 18, 1961, is the following:

"The defendant, Parke, Davis & Company, in 1956 combined and conspired with its wholesalers and others in the District of Columbia and Richmond, Virginia to unreasonably restrain commerce in pharmaceutical products in violation of Sections 1 and 3 of the Act of Congress of July 2, 1890 entitled, 'An Act to protect trade and commerce against unlawful restraints and monopolies', commonly known as the Sherman Act, as amended."

The remainder of the judgment describes the events of the summer of 1956. The only reference to 1957 is this:

"Dart Drug agreed [in 1956] to stop its cut price advertising and Parke, Davis continued to sell to Dart Drug until December 12, 1957 when it advised that concern that it would not longer sell to it on a direct basis. Dart is still able to obtain Parke, Davis supplies from its wholesalers but at a higher cost than when it was able to buy direct from Parke, Davis."

This reference is followed immediately by the closing paragraph of the judgment, implementing the Supreme Court's direction:

"This Court will retain the case on its docket for future action in the event the Government applies for further relief from an alleged resumption by Parke, Davis of illegal activity."

*the parties thereto* \* \* \*' \* \* \*
Thus, in construing a prior judgment for purposes of this statute, the court in the subsequent action does not sit as a trier of fact, *i. e.*, it does not have wide license to draw inferences from the judgment and record in the prior litigation. Rather, the court is circumscribed by the relatively narrow limits of the doctrine of estoppel. \* \* \* 'Such estoppel extends only to questions "distinctly put in issue and directly determined" [in the Government suit] \* \* \*.' Emich Motors Corp. v. General Motors Corp., 1951, 340 U.S. 558, 568—569, [71 S.Ct. 408, 95 L.Ed. 534] \* \* \*."

Eagle Lion Studios, Inc. v. Loew's, Inc., 248 F.2d 438, 444 (2d Cir. 1957), aff'd *per curiam*, 358 U.S. 100, 79 S.Ct. 218, 3 L.Ed.2d 147 (1958). And the Court went on to add that "whatever is crucial to the treble-damage case and is not distinctly determined in the previous government suit must be proven by direct evidence." 248 F.2d at 444, quoting from Monticello Tobacco Co. v. American Tobacco Co., 197 F.2d 629, 631 (2d Cir.), cert. denied, 344 U.S. 875, 73 S.Ct. 168, 97 L.Ed. 678 (1952).

To the same effect is the ruling of the First Circuit in International Shoe Machine Corp. v. United Shoe Machinery Corp., 315 F.2d 449 (1st Cir.), cert. denied, 375 U.S. 820, 84 S.Ct. 56, 11 L. Ed.2d 54 (1963), that, in a treble damage suit, the plaintiff could not introduce a Government judgment of violations in 1938–51 to prove violations in 1952–56. Said the court (315 F.2d at 459–460):

> "It is of course well settled that evidence that defendant had, in the past, committed illegal acts is not admissible to show that he has a proclivity towards similar wrongs in a subsequent proceeding. \* \* \* If [the plaintiff] \* \* \* does not have \* \* \* independent evidence [of a violation at the time charged in the complaint], we do not believe that he should be able to use the prior judgment as a crutch in the

attempt to supply the essential elements of his action. It would be subversive of the purpose of Section 5 to permit the introduction of a prior decree or judgment 'merely for its aura of guilt, or "to imply new wrongdoing from past wrongdoing." ' Monticello Tobacco Co. v. American Tobacco Co., [*supra*]. \* \* \*"

▮ No more than courts as triers of fact are juries to be exposed in treble damage suits to the temptations of inferring later violations from Government judgments as to earlier ones. In Theatre Enterprises Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), the Supreme Court sustained an instruction that the jury might not, absent additional direct evidence, consider judgments of conspiracies in 1945–48 as establishing an alleged conspiracy in 1949. See also Park Neponset Corp. v. Smith, 258 F.2d 452 (1st Cir. 1958), and Buckhead Theatre Co. v. Atlanta Enterprises, Inc., 327 F.2d 365 (5th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 158, 13 L. Ed.2d 92 (1964). These authorities have, if anything, *a fortiori* application here where there is an unchallenged and undisturbed finding, after the taking of evidence on the precise point, that the earlier conspiracy not only began, but also ended, in 1956.

To the extent, therefore, that Dart now represents to us that it should be permitted to go to trial because of the presumptions or inferences that will be available to the trier of fact because of the Government judgment, it is talking essentially the same language as was directed by its former counsel to the District Court. We, no more than that court, find it adequate to found a claim warranting trial. If it sounds so faintly in our own ears, we can hardly default the trial judge for its failure to awake more resounding echoes in his.

The District Court in its opinion correctly stated the law applicable to the arguments about presumptions and inferences, made by Dart to it and now to

us, in his comment that "the mere fact that a person has violated the law on one occasion is no proof that some later action of his which on its face is not a violation of law, must be tainted with the illegality of the prior act." Dart seems to us to approach this case as if it were suing for damages in respect of what happened in 1956. If such were the case, of course the judgment would have the effect it claims for it. But its suit is for damages asserted to flow from an act by Parke, Davis in 1957. To establish the illegality of that act under Section 1, it is not enough to prove that its motivation was that of punishment for discounting or anything else, however reprehensible.[6] What must be proved is that the act occurred in a contemporaneous framework of the combination, conspiracy, or agreement forbidden by the statute. And that proof may not be supplied at trial solely by a judgment which establishes no more than that such a framework did exist at an earlier point in time. When the converse of this proposition is pressed upon us as the essential basis for reversal, we are understandably disinclined to respond.

We see no occasion to speculate, as is the fashion, about the current state of health of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L. Ed. 992 (1919), because it has not been argued to us on this appeal that purely unilateral action can violate Section 1. To decide the issues before us we do not need to assay the meaning of Colgate in terms of demonstrable demarcations between unilateral and collaborative activities; our only essential frame of reference is the language of Section 1. It continues, among the ebb and flow of cases trying to draw such lines, to make illegal only contracts, combinations, and conspiracies. When a treble damage plaintiff suing under Section 1 responsibly represents either that it claims no concerted plan or activities or that it finds its proof thereof in a judgment relating to a prior violation—and we do not see much difference in legal effect between the two—we feel no compulsion to overturn the District Court's decision that there was no purpose to be served by going to trial.

Affirmed.

WRIGHT, Circuit Judge (concurring):

For a large, supposedly responsible, drug manufacturing concern, Parke, Davis' punishing of appellant apparently because its president testified as a Government witness in the criminal antitrust case against Parke, Davis is a most reprehensible act.[1] In the context

6. In the trial court counsel for the parties joined in presenting the matter on the assumption that the 1957 cut-off was motivated by Parke, Davis' antipathy towards Dart's pricing practices. The record suggests, however, that Dart really believed that it was being punished for the initiatives taken by it with the Department of Justice and the role it played in the criminal prosecution. It is argued to us that at least a jury could find that such was the case and that, if so, such a motivation "does violence to the policy of the Sherman Act." We agree. What does not follow is that an act so motivated in and of itself founds a claim for damages under Section 1 of the Act. A District Court which thought that it did was, rightly in our opinion, corrected in this error by the Second Circuit. House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2d Cir. 1962). We also agree with what that court had to say about the power of an equity court, by injunctions or contempt citations, to act in a proper case to eradicate interference with the court's functioning. But that is a different thing from stating a basis for the award of damages in a civil action. See, for example, in a non-section 1 context, Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725 (3d Cir. 1962).

1. Parke, Davis does not admit that it refused to deal with Dart because of its president's participation in the criminal antitrust case. However, the District Court in the civil antitrust case against Parke, Davis found that:

"On December 12, 1957, subsequent to the trial of the companion criminal action [dismissed by court November 5, 1957], Parke, Davis informed Dart Drug Company that it was permanent-

of this particular case, however, I agree with the court that relief must be denied. This is not to say that Government witnesses cannot be protected against this sort of reprisal. Antitrust drug violators are no more immune than other defendants from the criminal statutes concerning obstruction of justice. See 18 U.S.C. § 1503.

ly closing the Dart account and did not intend to have any further dealings with that company. * * * Parke, Davis' action in ceasing relations with Dart was a purely unilateral one, and there is no evidence that it had any relation to Dart's prices or advertising policies." United States v. Parke, Davis & Company, D.D.C., 164 F.Supp. 827, 834 (1958).

And the Supreme Court's opinion in the same case shows that apparently Dart alone among the retail price cutters was cut off by Parke, Davis. In United States v. Parke, Davis & Co., 362 U.S. 29, 36, 80 S.Ct. 503, 507, 4 L.Ed.2d 505 (1960), the Court states:

" * * * Parke Davis then stopped trying to promote the retailers' adher-ence to its suggested resale prices, and neither it nor the wholesalers have since declined further dealings with [retailer].5 A reason for this was that the Department of Justice, on complaint of Dart Drug Company, had begun an investigation of possible violation of the antitrust laws.

"5. Except that in December 1957, Parke Davis informed Dart Drug Company that it did not intend to have any further dealings with Dart. The latter has, however, continued to purchase Parke Davis products from wholesalers. Thus, Dart Drug cannot receive the volume discount on large quantity purchases."