**Robert S. DUNNING, Petitioner,**

v.

**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, Respondent.**

No. 82–1259.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 3, 1982.

Decided Oct. 11, 1983.

Joseph B. Scott, Washington, D.C., with whom Irving Kator, Washington, D.C., was on brief, for petitioner.

Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington,

D.C., were on brief, for respondent. Evangeline W. Swift, Atty., Merit Systems Protection Board, Washington, D.C., also entered an appearance for respondent.

Before WALD, BORK and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

Petitioner Robert Dunning seeks review of a decision by the Merit Systems Protection Board to affirm a 15-day suspension imposed on him by respondent, the National Aeronautics and Space Administration (NASA). He complains that the Board's action was invalid because the Board did not comply with its own procedural regulations in making its decision, and because the decision itself was arbitrary, capricious, and not supported by substantial evidence. We find none of these challenges to the Board's action valid, and affirm.

## I

Dunning, an aerospace engineer, has been employed at the Langley Research Center of NASA since 1959. For several years prior to 1978, he had been ranked near last in performance among those at the Center in his grade level. In March 1978, he was identified as one of three low performers in his Division. His supervisor, Jarrell Elliott, who had not been involved in identifying Dunning as a low performer, was instructed to inform Dunning of the identification, to give him a new assignment, and to work with him to upgrade his performance. Accordingly, on July 13, 1978, Elliott met with Dunning, told him about the identification, and gave him a research assignment requiring determination of the potential benefits of a supersonic aircraft with thrust vectoring capability.

Earlier in 1978, Dunning had applied for the position of Head, Stability Control Branch, which he was denied. In July 1978, he requested that NASA undertake an inquiry into the procedures used to fill the

vacancy. Displeased with NASA's response to his request, he asked the Civil Service Commission (whose functions in such cases now belong to the Merit Systems Protection Board) to review the procedures. When he advised Elliott that he had initiated this complaint, Elliott said that it was going to create a lot of extra work and tried unsuccessfully to persuade Dunning not to persist. In October 1978, the Civil Service Commission found Dunning's complaint not to warrant investigation, because it lacked sufficient factual basis.

In July 1978, Elliott started keeping notebooks on his meetings and conversations with Dunning, in anticipation that Dunning's complaint might create a need for documentation of his relations with Dunning. The notebooks recorded 14 meetings with Elliott between August 1978 and December 3, 1979 to discuss progress on the thrust vectoring project. After one such meeting in December 1978, attended also by Phillips, the head of Dunning's Division, Elliott and Phillips agreed that Dunning's performance was inadequate and that his within-grade pay increase should be withheld. That decision was reversed by the Director for Electronics, Stitt, who felt that while Dunning was not making much progress on the assignment, this was probably due to his having to spend too much time on other matters.

At the meeting held on August 3, 1979, and repeatedly at subsequent meetings, Dunning protested to Elliott that the project was a worthless assignment. Elliott nonetheless insisted that he continue working on it, and he did so.

On October 17, 1979, Dunning asked Elliott for a written work order for the thrust vectoring assignment. Elliott told him to draft one, which he did, dating the order November 1979. Elliott changed the date to August 1978, when he had first assigned Dunning the project.

On December 18, 1979, when asked to report on his progress, Dunning refused to do so until "proper sequencing" had been established. The meaning of "proper sequencing" is in dispute, but according to

Dunning it meant that his job order should be changed to delete Elliott's additions. As a result of this refusal, Elliott issued Dunning a written reprimand, the minimum penalty in NASA's tables for an offense of insubordination.

At the next meeting, on January 29, 1980, Dunning was again instructed to report his progress and again refused, on the ground that Elliott had changed the job order to make possible an adverse action and was therefore making the request in bad faith. Elliott warned him that his refusal would be considered insubordination. Elliott subsequently issued Dunning a notice of proposed suspension for 15 days, which was approved by Stitt, the NASA officer who had previously sided with Dunning on the within-grade pay raise.

Dunning appealed the suspension to the Philadelphia Regional Office of the Board. The presiding official assigned to the case found that Dunning's conduct was insubordinate, but that the suspension was tainted by Elliott's desire to retaliate against Dunning for the earlier filing of the unsuccessful Civil Service Commission complaint. NASA appealed to the Board, which vacated the presiding official's decision and affirmed the suspension. Dunning then petitioned this Court for review of the Board's decision.

## II

 The Board's regulations state that: the Board may grant a petition for review when it is established that:

(a) New and material evidence is available that, despite due diligence, was not available when the record was closed; or

(b) The decision of the presiding official is based on an erroneous interpretation of statute or regulation.

5 C.F.R. § 1201.115 (1983). Petitioner asserts that the only arguably applicable portion of this regulation, referring to a "decision ... based on an erroneous interpretation of statute," does not include what was appealed to the Board here, an alleged misapplication of the law to the facts. The

Board does not share that interpretation, and there is some support in the history of the regulation for its more expansive view.[1] We find it unnecessary to resolve this issue and assume, without deciding, that the petitioner's interpretation is correct. Even on that assumption the agency has reasonably applied its rules to permit the review here provided.

While setting forth the showings on the basis of which "the Board may grant a petition for review," § 1201.115 does not explicitly provide that review will not be granted in any other circumstance. Moreover, any negative implication that might ordinarily arise is eliminated by the second following section, which provides that "[t]he Board may reopen and reconsider a decision of a presiding official on its own motion at any time, notwithstanding any other provision of this part." 5 C.F.R. § 1201.117. (It is clear that "reopening" does *not* require that the presiding official's decision first become final through expiration of the specified period without filing of an appeal. *See* 5 C.F.R. § 1201.113(a).) That provision makes it clear beyond doubt that § 1201.115 is not a categorical restriction upon the Board's review authority, but only sets forth the most common situations in which review will ordinarily be entertained. Or to put the point another way: If, in entertaining this appeal, the Board was acting beyond the specified limits of § 1201.115, it was clearly acting within its reserved discretion under § 1201.117. Thus, even accepting petitioner's interpretation of § 1201.115, the Board's regulations in effect establish a procedure similar to that which we ourselves employ, setting forth certain restrictions on the issues we will hear, *see, e.g., Brown v. Collins,* 402 F.2d 209, 213 (D.C.Cir.1968), but reserving the power to depart from those restrictions when the occasion warrants, *see, e.g., Dart*

*Drug Corp. v. Parke, Davis & Co.,* 344 F.2d 173, 183 (D.C.Cir.1965).

### III

Turning next to petitioner's substantive complaints, we first confront his challenge to the Board's finding that he was insubordinate. He contends that NASA failed to prove both of the elements of insubordination: that there was (1) a clear order, to which (2) he willfully failed to respond.

■ Before the Board, NASA has the burden of showing insubordination by a preponderance of the evidence. 5 U.S.C. § 7701(c)(1) (1982). We must sustain the Board's determination on review, however, if it is supported by substantial evidence on the record. 5 U.S.C. § 7703(c)(3). We believe the record contains ample evidence to support the presiding official's and the Board's finding that there was a clear order to which Dunning willfully failed to respond.

The record shows unequivocally that Dunning himself drafted the work order for the thrust vectoring project. His assertion that it was ambiguous, and that the order to report upon it was therefore unclear, rests upon the fact that Elliott changed its date to relate back to the time the project was originally assigned. He claims that this confused him because he thought he had already completed the original assignment. It was, to say the least, not necessary for the Board to believe that the backdating rendered incomprehensible to Dunning a work order he himself had prepared. The Board was fully justified in finding that the request to report was clear enough to constitute a valid order.

As for willful failure to respond: Petitioner's contention that he did not refuse to report, but was merely seeking guidance on what to report about, does not withstand

---

1. The 1978 version of the rule, 5 C.F.R. § 772.-310 (1978), and the proposed revision of that version, 44 Fed.Reg. 17975 (Mar. 23, 1979), included among the reviewable actions "a misapplication of established policy" and decisions "of a precedential nature involving new or unreviewed policy considerations" that may have wide effect. The statement of basis and purpose accompanying the final rule did not explain the deletion of these portions of the proposal, and further stated that all unexplained changes were "minor or technical in nature," 44 Fed.Reg. 38342 (June 29, 1979).

scrutiny. The record unequivocally establishes that he twice expressly conditioned his willingness to report on the making of changes in the work order. In this regard also, therefore, substantial evidence supports the Board's and the presiding official's determination.

### IV

■ Petitioner's final contention is that the Board incorrectly dismissed his claim that NASA suspended him in reprisal for his challenge to NASA's promotion procedures. Reprisal constitutes a prohibited personnel practice under 5 U.S.C. § 2302(b)(9), for which the employee bears the burden of proof. 5 U.S.C. § 7701(c)(2)(B); *see Frazier v. Merit Systems Protection Board,* 672 F.2d 150, 165 (D.C.Cir.1982). The Board's finding that Dunning failed to meet that burden is supported by substantial evidence on the record.

According to the Board, whose interpretation of its governing statute in this regard we find reasonable and accept, *see Frazier, supra,* 672 F.2d at 162, to establish a violation of § 2302(b)(9) an employee must show that (1) he engaged in protected activity; (2) he was subsequently treated adversely by his employer; (3) the deciding official had actual or constructive knowledge that the employee had engaged in the protected activity; and (4) there is a causal connection between the protected activity and the adverse action. Jt.App. at 12. The Board found that Dunning had not established the causal connection. It disagreed on this point with the presiding official, who had found that Elliott's notebooks on Dunning proved that his recommendation of Dunning's suspension was motivated by his desire to retaliate for the complaints about promotion procedures. The Board found otherwise, saying that the keeping of the notebooks was fully justified by Dunning's identification as a low performer, and that their contents merely documented efforts to deal with a difficult, non-productive employee. We find the Board's determination to be supported by substantial evi-

dence. Although the notebooks amply reflect Elliott's exasperation with Dunning, they do not necessarily establish that the exasperation resulted from Dunning's complaint about promotion procedure or, even more remotely, that there was a causal connection between the complaint and the recommendation of dismissal.

Dunning contends that a higher standard of proof should be applied to the Board's decision to overrule the presiding official on a question of fact, citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). *Universal Camera* established no such principle. To the contrary, it explicitly stated that "[t]he 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree." 340 U.S. at 496, 71 S.Ct. at 469. It requires only that we give hearing officers' findings "the relevance that they reasonably command," *id.* at 497, 71 S.Ct. at 469, which "depends largely on the importance of credibility in the particular case," *id.* at 496, 71 S.Ct. at 469. On the present issue, credibility is relatively insignificant: the Board was as capable of evaluating the central evidence, the notebooks, as the presiding official.

*Petition Denied.*