**Irvin J. HARRIS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 2559.

Municipal Court of Appeals for the District of Columbia.

Argued May 23, 1960.

Decided July 19, 1960.

Rehearing Denied July 29, 1960.

**504**

Melvin M. Burton, Jr., Washington, D. C., for appellant.

Nathan J. Paulson, Asst. U. S. Atty., Washington, D. C., with whom Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before ROVER, Chief Judge, and HOOD and QUINN, Associate Judges.

ROVER, Chief Judge.

Appellant was convicted of narcotics vagrancy pursuant to Code 1951, § 33–416a (Supp. VIII).[1] He had a prior conviction as a narcotic drug user, and having been found in a place where narcotics were kept, found, used or dispensed was thus classified as a narcotics vagrant within the meaning of the act. He received a sentence of one year from which he appeals.

The facts upon which the conviction rests are as follows. On the morning of August 26, 1959, several officers of the Metropolitan Police Department Narcotics Squad, acting under a search warrant issued on information of narcotics violations, searched the premises in which appellant was found. Extensive gambling and illegal whiskey sales were known to be taking place in the house, and gambling was appellant's admitted reason for being there at the time.

As the officers entered the front door the occupants of the house scattered. Two were apprehended trying to leave by the front door, one was caught after he had jumped out of an open window, and appellant, along with several others, was arrested in a first-floor dining room. The first officer to enter did not try to arrest any of the occupants, but went immediately to

1. "(a) The purpose of this section is to protect the public health, welfare, and safety of the people of the District of Columbia by providing safeguards for the people against harmful contact with narcotic drug users who are vagrants within the meaning of this section and to establish, in addition to the Hospital Treatment for Drug Addicts Act for the District of Columbia, further procedures and means for the care and rehabilitation of such narcotic drug users.

"(b) For the purpose of this section—
"(1) the term 'vagrant' shall mean any person who is a narcotic drug user or who has been convicted of a narcotic offense in the District of Columbia or elsewhere and who—
\*　　\*　　\*　　\*　　\*
"(B) is found in any place, abode, house, shed, dwelling, building, structure, vehicle, conveyance, or boat, in which any illicit narcotic drugs are kept, found, used, or dispensed \* \* \*."

the rear of the second floor where he apprehended one Hawkins in the act of throwing several objects out of a bathroom window. He noted where the objects fell and thereafter made his way outside to the rear of the house and recovered them. They proved to be a plastic vial containing forty-nine capsules of denatured heroin plus a needle, syringe and metal bottle-cap "cooker" all of which bore traces of heroin hydrochloride. A second cap with traces of the drug was found still on the bathroom window ledge. Hawkins appears to have been the person described in the search warrant as having and dispensing the narcotics. An officer testified at trial that appellant had fresh needle marks on his arm which were estimated to be no more than fifteen days old.

■ Appellant claims he did not know that narcotics were kept on the premises, and his first assignment of error is that the statute should not be interpreted as abrogating criminal intent as an element of criminal responsibility, and that it was error for the court to instruct the jury that scienter or guilty knowledge was not a necessary element of the crime. This court had stated before, in Jenkins v. United States, D.C.Mun.App., 146 A.2d 444, that in prosecutions under this act the Government need not prove guilty knowledge as an element of the crime of narcotics vagrancy. The stated purpose of the act is the protection of the public and not the punishment of offenders. It is therefore a legislative exercise of the police power aimed at social betterment by regulating a class of people whose ability to resist narcotic addiction anew would be considerably lessened if they were cast back into their old environs consorting with other users or those whose business is narcotics traf-

fic. In proscribing the activities of narcotics vagrants the law places the burden upon the violator to know the character of his associates and the nature of the places which he visits, requiring him to exercise a degree of care so that narcotics violations are thereby made impossible or improbable. In this type of police regulation it is now too settled to doubt that the legislature may dispense with intent as an element of criminal liability when the regulation is in the exercise of the police power for the benefit of the people.[2]

■ Also assigned as error is the fact that the narcotics were found outside the house. Appellant claims this should prevent a finding that he was in a house or place where narcotics were kept. Without even resorting to the concept of the curtilage as encompassing that ground associated with the reasonable domestic use of the house, the fact that the narcotics were seen being thrown out of and falling from a window in the house, and that one metal cap with traces of heroin was found still in the house makes this argument without merit.

■ Appellant also contends that the house in which the narcotics were found is actually a rooming house, and that he was in the common dining room of the house and not in the second-floor apartment or room from which Hawkins attempted to dispose of the drugs and other items. His theory on this point is that rooms or apartments under the control of individual tenants constitute separate places or abodes for the purposes of the statute, even though located in one common building. Consequently, he argues, one cannot be held criminally liable for the illicit occurrences which transpire in those rooms occupied by other tenants elsewhere in the building.

2. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288; United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604; Kirkham v. City of North Little Rock, 227 Ark. 789, 301 S.W.2d 559, 64 A.L.R.2d 1032; People v. Darby, 114 Cal.App.2d 412, 250 P.2d 743, appeal dismissed, 345 U.S. 937, 73 S.Ct. 833, 97 L.Ed. 1364; State v. Striggles, 202 Iowa 1318, 210 N.W. 137, 49 A.L.R. 1270; People v. Cramer, 247 Mich. 127, 225 N.W. 595; Commonwealth v. Koczwara, 188 Pa.Super. 153, 146 A.2d 306.

Appellant is correct in theory, but the evidence wholly fails to establish that that was the nature of the building in question. The testimony of the witnesses does not show who owned the building, nor who its tenants were, their number or the nature of their tenancy, nor is there anything to lend credence to appellant's argument except perhaps, the fact that Hawkins occupied a second-floor bedroom. But in the absence of additional proof that fact alone is not inconsistent with the Government's position. We think the true nature of the building can be gleaned from appellant's own testimony.[3] It was a notorious gambling and drinking house frequented by innumerable people at one time or another. That one or two of the organizers of these activities occupied rooms on the premises hardly changes the character of the place to a rooming house, whether those coming to the house to partake in the illicit activities were admitted to the individual rooms or not.

We find no error in these or in other assignments which we have considered but do not think necessary to discuss.

Affirmed.

3. "Q. For what purpose had you gone there? A. Well, I go there very week to gamble.

\* \* \* \* \*

"Q. Did you know that narcotics was sold, or do you know whether it's ever been sold or dispensed on those premises? A. The only thing I know is that—the only thing I know that was in there was whiskey and gambling.

"Q. You do know they sold whiskey and they gambled there? A. Everyone does.

\* \* \* \* \*

"Q. You stated you have been going here regularly to gamble; is that correct? A. Every weekend.

"Q. Were those people there regularly? A. Not all at once, regularly.

"Q. But did those people generally come there, say every other weekend, or every three weeks? A. Everybody in the Southeast who do any gambling will be there.

"Q. About how many people were there at this time? A. The people I named; and there was two others.

"Q. At that time there was less than ten; is that correct? A. Ten or—I named about eight. I said two others.

"Q. Ten would be about approximately it? A. Approximately ten."