Lloyd A. HALL, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 20711.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 19, 1969.

Decided Dec. 17, 1971.

As Amended Jan. 7, 1972.

Mr. Russell B. Pace, Jr., Washington, D. C. (appointed by this Court), for appellant.

Mr. Carl S. Rauh, Asst. U. S. Atty., for appellee. Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, Victor W. Caputy, Asst. U. S. Atty., and Lee A. Freeman, Jr., Asst. U. S. Atty., at the time the brief was filed, were on the brief for appellee. Messrs. Thomas A. Flannery, U. S. Atty., and Roger E. Zuckerman, Asst. U. S. Atty., also entered appearances for appellee.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON and ROBB, Circuit Judges, sitting *en banc*.

## ON REHEARING EN BANC

SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

The question before us is whether evidence of appellant's possession of narcotics, discovered on a search accompanying his arrest under the District of Columbia Narcotic Vagrancy Act,[1] was admissible in a prosecution leading to his conviction under federal narcotic laws.[2] The arrest and search antedated our holdings in Ricks v. District of Columbia (*Ricks I*)[3] that three subsections of the District's general vagrancy statute, and in Ricks v. United States (*Ricks II*)[4] that two subsections of the Narcotic Vagrancy Act, including the one our appellant ostensibly violated prior to his arrest, could not constitutionally support criminal convictions. We now hold that appellant's timely motion to suppress the challenged evidence should have been honored and, in consequence, that his conviction must be reversed.[5]

### I

At about 2:00 o'clock on the morning of Saturday, May 28, 1965, two plainclothes officers on narcotic vagrancy detail watched appellant and another man as they walked up and down a block in Southeast Washington. Both were known to one of the officers as drug users but, as the other officer put it at trial, "[t]hey weren't really doing anything." About ten minutes later, the officers approached appellant and his companion. In answer to questions, appellant produced identification and said that he was unemployed, had injected two capsules of heroin two days before, and had come to the Southeast area to be with friends. The officers informed appellant that a narcotic vagrancy observation had been noted.[6]

The next night, at about the same time on a different street, the two officers saw appellant in the company of three men whom the officers recognized as

1. D.C.Code § 33–416a (1967). The provisions relevant on this appeal are quoted *infra* notes 12–13.

2. 21 U.S.C. § 174 (1964), repealed 84 Stat. 1291 (1970); 26 U.S.C. § 4704(a) (1964), repealed 84 Stat. 1292 (1970). The conviction, if otherwise valid, is unaffected by the repeals. 84 Stat. 1294 (1970).

3. 134 U.S.App.D.C. 201, 414 F.2d 1097 (1968).

4. 134 U.S.App.D.C. 215, 414 F.2d 1111 (1968).

5. This appeal was heard initially by a panel, which deferred its disposition pending decision of the *Ricks* cases, *supra* notes 3–4. Thereafter the panel, by a divided vote, concluded that appellant's conviction should be set aside unless the Government could support its seizure of the narcotics on probable cause unrelated to the Narcotic Vagrancy Act, and remanded the case to the District Court to afford the Government that opportunity. Later, on the Government's suggestion, the court granted this rehearing *en banc*.

6. We later describe, Part IV, *infra*, the narcotic vagrancy observation and its function in vagrancy enforcement.

drug users. A similar conversation followed, and appellant was advised that a second narcotic vagrancy observation had been made. Appellant was also told that upon a third observation he would become subject to arrest.[7]

The same officers spotted appellant at about 2:00 o'clock on the morning of Saturday, June 5, 1965, this time standing in front of a restaurant. A few minutes later, appellant was joined by a man the officers knew as a drug user, and a woman without any known involvement with narcotics. Appellant and the woman walked off arm-in-arm, accompanied by the man, and a little more than a block further the officers stopped them. In response to questioning, appellant stated that he had injected one capsule of heroin the day before, was unemployed, and was in the area to see friends. The officers arrested appellant under the Narcotic Vagrancy Act, searched him, and found the drugs that underlie the conviction under review.[8]

Following indictment, appellant moved for suppression of any evidence of the seizure of the narcotics. The motion, grounded on the claim that his arrest did not comport with the Fourth Amendment, was twice denied.[9] At trial, by the court, both officers testified to the discovery of the drugs during the search. As stated, appellant was found guilty as charged.

## II

Immediately before the confrontation that led to his arrest, appellant was exercising one of the most ordinary yet most fundamental elements of personal liberty.[10] He and two others were walking down a public sidewalk. They had gone little more than a block when they were stopped and interrogated. Police officers asked appellant to give "a good account of himself," [11] and he answered that he had come to the area to be with his friends. This explanation was rejected, and appellant was arrested pursuant to Subsection (C) of the Narcotic

---

7. In addition, the officers "advised" appellant "that being a narcotic drug user, he should stay off the street after midnight, that he shouldn't be in the company of other narcotic drug users, that he should try to get himself a job, and try to get himself straightened out and to stop using narcotic drugs."

8. At no time has appellant raised any question concerning the scope of the search which followed his arrest. His argument has always been that the arrest itself was illegal and could support no incidental search. For the reasons stated in Parts III and IV, *infra*, we agree on that point. Accordingly, we express no view on other potential infirmities in the search.

9. Appellant's written motion asserted the illegality of the search on the ground that he "was arrested without a warrant and without probable cause and that such arrest was in violation of the protections of the 4th Amendment of the United States Constitution." The motion was first denied before trial. After the Government had closed its case, appellant renewed the motion and the Government resisted solely on the ground that conduct by appellant violative of the Narcotic Vagrancy Act furnished probable cause for the arrest. The motion was again denied. The

implications our *Ricks* decisions, supra notes 3–4, generate for the probable cause question persuade us to exercise our discretion in favor of a close look into the relationship between appellant's conduct and Fourth Amendment requirements. See note 26, *infra*.

10. See Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) ("[l]iberty under law extends to the full range of conduct which the individual is free to pursue"); Shuttlesworth v. City of Birmingham, 382 U.S. 87, 90, 86 S.Ct. 211, 213, 15 L.Ed.2d 176 (1965) ("[t]he constitutional vice" of an ordinance which, read literally, "says that a person may stand on a public sidewalk in Birmingham only at the whim of any police officer . . . needs no demonstration."); Gomez v. Layton, 129 U.S.App.D.C. 289, 290 n. 1, 394 F.2d 764, 765 n. 1 (1963) ("the due process clause protects liberty of movement regardless of whether first amendment concerns . . . are at stake").

Compare Douglas, Vagrancy Arrests on Suspicion, 70 Yale L.J. 1, 4 (1940):
> I have known judges and lawyers who, afflicted with insomnia, have wandered the streets at night.

11. See note 12, *infra*.

Vagrancy Act [12] and was immediately searched. The record makes it evident that the arrest came solely in consequence of what the officers viewed as a violation of Subsection (C).[13]

That subsection is one of the two provisions [14] *Ricks II* [15] held to be too imprecise in its proscriptions to authorize a conviction consistently with due process of law.[16] In neither of those subsections could we find "a degree of specificity that would enable citizens of ordinary intellect to distinguish wrong from right, or administrators or jurists to confidently make applications." [17] On the contrary, their provisions, we said, "fall short of the constitu-

tional dictate that criminal conduct be defined with reasonable certainty," [18] and "open the door wide to convictions on suspicion in lieu of proof of criminality." [19]

■ Indubitably, then, appellant could not have been imprisoned for activity within the sweep of Subsection (C).[20] But the fact that we are not faced with a conviction of narcotic vagrancy does not mean that the uncertainty in Subsection (C) can simply be ignored. Statutory vagueness, it is apparent, may produce an unconstitutional interference with personal freedom even when incarceration is not involved.[21] Many years ago the Supreme

12. D.C.Code § 33-416a(b) (1) (C) (1967), which provides:

(b) For the purpose of this section—

(1) The term "vagrant" shall mean any person who is a narcotic drug user or who has been convicted of a narcotic offense in the District of Columbia or elsewhere and who—

* * * * *

(C) wanders about in public places at late or unusual hours of the night, either alone or in the company of or association with a narcotic drug user or convicted narcotic law violator, and fails to give a good account of himself.

13. Although the arresting officers did not cite Subsection (C) at trial, one stated that the arrest was made pursuant to the "Uniform Narcotic Act, vagrancy," and that a narcotic vagrancy observation could occur whenever he spotted a known drug user "employed or unemployed on the street [at] late or unusual hours of the night alone or in the company of others"—virtually a quote from Subsection (C), see note 12, *supra*. In any event it is clear that nothing else could possibly have presented an occasion for appellant's arrest. The Narcotic Vagrancy Act contains its own provision, D.C. Code § 33-416a(c), on narcotic vagrancy arrests:

Whenever any law-enforcement officer has probable cause to believe that any person is a vagrant within the meaning of this section, he is authorized to place that person under arrest and to confine him in any place in the District of Columbia designated by the Commissioners thereof.

14. The other was D.C.Code § 33-416a(b) (1) (A) (1967).

15. *Supra* note 4.

16. 134 U.S.App.D.C. at 218-220, 414 F.2d at 1114-1116. See also Palmer v. City of Euclid, 402 U.S. 544, 545, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971). And see, e. g., Bouie v. City of Columbia, 378 U.S. 347, 351, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); Lanzetta v. New Jersey, 306 U. S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939); Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

17. 134 U.S.App.D.C. at 219, 414 F.2d at 1115.

18. *Id.* at 220, 414 F.2d at 1116 (footnote omitted).

19. *Id.* at 219, 414 F.2d at 1115. In *Ricks I, supra* note 3, we invalidated portions of the general vagrancy law for similar reasons. Those were D.C.Code §§ 22-308 (1), (3), (8) (1967).

20. See *Ricks II, supra* note 4. See also Palmer v. City of Euclid, *supra* note 16. And see Champlin Ref. Co. v. Corporation Comm'n, 286 U.S. 210, 243, 52 S.Ct. 559, 568, 76 L.Ed. 1062 (1932) (the imposition of "any penalty prescribed" for the violation of an unconstitutionally vague statute "constitutes a denial of due process of law"); United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). *Cf.* United States v. U. S. Coin and Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971) (statute invalid on self-incrimination grounds).

21. See Bagett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (loss of public employment); Cramp v. Board of Public Instruction, 368 U.S.

Court declared that "it is not the penalty itself that is invalid, but the exaction of obedience to a rule or standard that is so vague and indefinite as to be really no rule or standard at all." [22] The Court has also pointed out that "[t]he vices inherent in an unconstitutionally vague statute" include not only "the risk of unfair prosecution" but also "the potential deterrence of constitutionally protected conduct." [23]

We are obligated, then, to scrutinize any governmental restriction on the citizen's liberty of movement imposed under color of a statute obscure in meaning,[24] and in the litigation before us there is more than the usual reason to do so. The case is in the posture of an arrest and concomitant search, on the one hand attacked as violative of Fourth Amendment guaranties. The search, on the other hand, is sought to be justified as one incidental to an arrest under a statute then presumptively valid. So, with the opposing contentions focusing on appellant's arrest pursuant to Subsection (C) and the search that followed, the Fourth Amendment is directly implicated. We turn, then, to examine Subsection (C) and its impact on appellant in light of the Reasonable Search and Seizure Clause [25] of that Amendment.[26]

## II

◼ Neither Congress in fashioning a statute,[27] nor a law enforcement officer in executing a statute,[28] is free to compromise or ignore the Fourth Amendment.[29] The validity of an arrest

---

278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961) (same) ; Jordan v. DeGeorge, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951) (deportation) ; Czarra v. Board of Medical Supervisors, 25 App.D.C. 443 (1905) (revocation of professional license). *Cf.* Barsky v. Board of Regents, 347 U.S. 442, 74 S.Ct. 650, 98 L.Ed. 829 (1954) ; Phillips v. Ballinger, 37 App.D.C. 46 (1911).

22. Champlin Ref. Co. v. Corporation Comm'n, *supra* note 20, 286 U.S. at 243, 52 S.Ct. at 568. See also Boutilier v. INS, 387 U.S. 118, 123, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967) ; Cramp v. Board of Public Instruction, *supra* note 21; A. B. Small Co. v. American Sugar Ref. Co., 267 U.S. 233, 239, 45 S.Ct. 295, 69 L.Ed. 589 (1925) ; Bagett v. Bullitt, *supra* note 21.

23. Cramp v. Board of Public Instruction, *supra* note 21, 368 U.S. at 283, 82 S.Ct. at 279.

24. See Gomez v. Layton, *supra* note 10.

25. See note 29, *infra*.

26. This court has not previously passed on the precise question presented here. Since in neither of the *Ricks* cases, *supra* notes 3–4, was there an issue of search or seizure, we considered the involved vagrancy provisions only in relationship to the vagrancy convictions they purported to underpin. In Worthy v. United States, 133 U.S.App.D.C. 188, 409 F.2d 1105 (1968), which was a narcotics prosecution based, similarly to the instant case, on a seizure of drugs incidently to a vagrancy arrest, we declined to consider the

pre-*Ricks* claim of unconstitutionality of the vagrancy statute because the accused's probable cause challenge in the trial court did not assert that claim as a factor. *Id.* at 193, 409 F.2d at 1110. In Johnson v. United States, 125 U.S.App.D.C. 243, 370 F.2d 489 (1966), which affirmed a conviction of carrying an unlicensed pistol found upon an arrest, not for vagrancy but for disorderly conduct, the constitutional attack sought to be launched against the disorderly conduct statute was, as is revealed by examination of the parties' briefs, devoid of any claim that the statute authorized or facilitated arrests on suspicion. And in Freeman v. United States, 116 U.S.App.D.C. 213, 322 F.2d 426 (1963), the arrest was bottomed, not upon a violation of the Narcotic Vagrancy Act, but upon probable cause independently arising. *Id.* at 214–215, 322 F.2d at 427–428. Compare Kelley v. United States, 111 U.S.App.D.C. 396, 298 F.2d 310 (1961). Apparently no other decision of this court has addressed any question resembling even remotely that which we face in the instant case.

27. See Sibron v. New York, 392 U.S. 40, 59–61, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ; Cooper v. California, 386 U.S. 58, 61, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

28. See, *e. g.*, the cases cited *infra* note 33.

29. "The right of the people to be secure in their persons. houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable

and incidental search is not necessarily established by the fact that the arresting officer's action was endowed, expressly or impliedly, with power statutorily conferred.[30] A legislature may not "authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct."[31] On the contrary, police conduct effecting the arrest of a citizen however it comports with a statute, must in the end pass constitutional muster.[32]

An inexorable command of the Fourth Amendment is that no arrest, and no search not incidental to a valid arrest, may stand save upon probable cause.[33] That mandate, we are convinced, was disregarded in this case. For although Subsection (C) purports to define a substantive offense, it does so in language so ambiguous as to intercept suspected as well as actual criminality—and even innocent conduct—and thus it precipitates arrests on conjecture alone.[34] And the administrative policies shaping enforcement of the statute, as will appear,[35] have in practice led to arrests on suspicion of other activity prohibited by the legislature without reasonable ground which would justify an arrest therefor.

We first examine the legislation. Vagrancy laws have as a class long been thought to facilitate arrests on sheer speculation.[36] Their use to gain custody of reputed perpetrators of more serious offenses for which probable cause to arrest is lacking has ofttimes been the topic of critical comment.[37] So also has been their use to place in custody persons who, because they fall within some hazy definition of the status of vagrancy, are assumed likely to be or to become persons who have committed or are likely to commit acts prohibited by the legislature.[38]

Subsection (C) is plainly open to these attacks. The Narcotic Vagrancy Act makes "being a vagrant" a misdemeanor,[39] and Subsection (C) defines as a vagrant any narcotic drug user or convicted narcotic offender who "wanders about in public places at late or unusual hours of the night . . . and fails to give a good account of himself."[40] As in Ricks II we held, this effort to create a substantive status crime—an aspect of the status crime of vagrancy[41]—was void for vagueness.[42] In the case at bar, Subsection (C) is unveiled as more than just an abortive

cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.Const. amend IV.

30. Sibron v. New York, supra note 27, 392 U.S. at 60–61, 88 S.Ct. 1889.

31. Id. at 61, 88 S.Ct. at 1902.

32. Id. at 60–61, 88 S.Ct. 1889. Cooper v. California, supra note 27, 386 U.S. at 61, 87 S.Ct. 788.

33. E. g., Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

34. See notes 12–13, supra.

35. See Part IV, infra.

36. See authorities cited infra notes 37–38.

37. Amsterdam, Federal Constitutional Restrictions On the Punishment of Crimes of Status, Crimes of General Obnoxiousness, Crimes of Displeasing Police Officers, and the Like, 3 Crim.L.Bull. 205, 226–227; Douglas, Vagrancy Arrests on Suspicion, supra note 10, at 9–10, 12–13;

Foote, Vagrancy-type Law and Its Administration, 104 U.Pa.L.Rev. 603, 628–630 (1956); Hall, The Law of Arrest in Relation to Contemporary Social Problems, 3 U.Chi.L.Rev. 345, 368–370 (1936); Lacey, Vagrancy and Other Crimes of Personal Condition, 66 Harv. L.Rev. 1203, 1218–1219 (1953); Note, The Vagrancy Concept Reconsidered: Problems and Abuse of Status Criminality, 37 N.Y.U.L.Rev. 102, 128–130 (1962); Note, Use of Vagrancy-Type Laws for Arrest and Detention of Suspicious Persons, 59 Yale L.J. 1351 (1950).

38. Amsterdam, supra note 37, at 227; Foote, supra note 37, at 625–628.

39. D.C.Code § 33–416a(g) (1967).

40. See note 12, supra.

41. See District of Columbia v. Hunt, 82 U.S.App.D.C. 159, 161–162, 163 F.2d 833, 835–836 (1947).

42. Ricks II, supra note 4, 134 U.S.App. D.C. at 218–219, 414 F.2d at 1114–1115. See also Ricks I, supra note 3, 134 U.S. App.D.C. at 211, 414 F.2d at 1107.

legislative attempt to erect a new substantive offense. The dimness in meaning which leaves its boundaries beyond the citizen's ability to identify does the same for policemen called upon to enforce it. Because the elements of the Subsection (C) offense are obscure, even officers engaged in its good faith effectuation cannot gauge justification for Subsection (C) arrests consistently with Fourth Amendment principles. About the only thing the fuzzy language of Subsection (C) illuminates is the probability that the substantive status offense it prescribes will be deemed evidenced by conduct which does no more than arouse a suspicion of criminality. Moreover, police officers, duty bound to faithfully execute the criminal laws, could hardly be expected to ignore either the broad latitude of discretion the statute confers or the implicit statutory concept of vagrancy enforcement as a device for controlling suspected but unprovable non-vagrancy crime. Thus the vice of vagueness, which precludes prosecution and punishment for alleged violations of Subsection (C), becomes intermeshed with an inherent tendency to promote arrests on mere surmise.[43]

Seventy-one years ago this court, in a decision never questioned since, invalidated a statute purporting to authorize arrest and conviction of *"suspicious persons."*[44] The present Subsection (C) does not vary significantly; it does the same for merely *suspicious conduct.* In consequence, the statutory authorization for arrest on "probable cause to believe that [a] person is a vagrant within the meaning of" Subsection (C)[45] really requires no more than a plausible basis for a speculation on criminality. That is a license to arrest on suspicion alone and, as such, is plainly at war with the Fourth Amendment.[46]

## IV

What is manifest on the face of Subsection (C) becomes the more vivid when it is seen in its mode of accustomed operation at the time of appellant's arrest.[47] For what the broad and un-

43. This is not to say that the officers who took appellant into custody made a sham arrest as a pretext for an exploration and possible confirmation of suspicions of drug possession. Compare United States v. Lefkowitz, 285 U.S. 452, 467, 52 S.Ct. 420, 76 L.Ed. 877 (1932); Hutcherson v. United States, 120 U.S.App.D.C. 274, 277, 345 F.2d 964, 967, cert. denied, 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965); McKnight v. United States, 87 U.S.App.D.C. 151, 152, 183 F.2d 977, 978 (1950); Taglavore v. United States, 291 F.2d 262, 264–266 (9th Cir. 1961). In no wise does our decision herein depend upon such a conclusion.

44. Stoutenburgh v. Frazier, 16 App.D.C. 229 (1900).

45. See note 13, *supra*.

46. Beck v. Ohio, *supra* note 33, 379 U.S. at 96–97, 85 S.Ct. 223; Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Henry v. United States, *supra* note 33, 361 U.S. at 104, 80 S.Ct. 168.

47. When, in 1965, the challenged arrest and search occurred, administration of the Narcotic Vagrancy Act utilized a series of vagrancy observations preceding a vagrancy arrest, as later described in text. This procedure had been inaugurated long before, see Metropolitan Police Department, Memorandum Order No. 23, Series 1954 (March 23, 1954), and was in operation when our *Ricks* decisions were announced in 1968. Shortly thereafter, the police department discontinued vagrancy observations and arrests under the three subsections invalidated in *Ricks I*, and vagrancy arrests under the two invalidated in *Ricks II*. Metropolitan Police Department, Memorandum on Vagrancy and Narcotic Vagrancy Observations and Arrests (Feb. 17, 1969). The latter directive did not, however, completely halt the practice of observations, for it specifically provided that "[t]he policies announced herein do not preclude an officer from observing persons engaged in suspicious activity in public space and from approaching those persons and making inquiry." See Gomez v. Wilson, 139 U.S.App.D.C. 122, 124, 430 F.2d 495, 497 (1970). The practice at the moment, if any, is rendered unclear by the District Court's recent decision that vagrancy observations which involve stopping and questioning impinge on the Fourth Amendment. Gomez v. Wilson, 323 F. Supp. 87 (D.D.C.1971).

certain contours of the statutory language made a distinct possibility in vagrancy law administration, enforcement practices made a reality. Those practices, as will appear,[48] stemmed from efforts calculated to produce evidence to enhance success in vagrancy prosecutions. The result, practically inevitable in any program to enforce the ill-defined prohibitions of Subsection (C), has been a dilution of even the relatively meaningless probable cause standard the Narcotic Vagrancy Act incorporates,[49] and a flouting of the Reasonable Search and Seizure Clause as well.

The utilization of vagrancy arrests to incarcerate suspicious characters without probable cause has been confirmed by the testimony, summarized in our *Ricks* opinions, of those in best position to know.[50] The technique in vogue when appellant was arrested was a multi-step process. Arrests were preceded by a series of vagrancy observations, each involving surveillance and questioning of individuals found on the streets,[51] followed by recordation and intra-departmental dissemination of the information obtained.[52] The inquiries covered matters related to "giv[ing] a good account of himself," [53] and ranged beyond to a probe into present and past use of narcotics.[54] After three vagrancy observations, the individual observed became a candidate for a vagrancy arrest.[55] Appellant ran the full gamut of this procedure.

Persons for whom there was probable cause to arrest for violation of narcotic laws were arrested therefor, and were not subjected just to a narcotic vagrancy observation.[56] But where there was a basis only to "suspect" one "of some form of crime," the observation was "sort of something you do instead of making an arrest." [57] So it was that Hattie Mae Ricks was selected for a vagrancy observation because in a police officer's "opinion she was involved in some sort of an illegal activity."[58] So,

48. See note 51, *infra.*

49. See note 13, *supra.*

50. See *Ricks I, supra* note 3, 134 U.S.App. D.C. at 212–214, 414 F.2d at 1108–1110; *Ricks II, supra* note 4, 134 U.S.App. D.C. at 219–220, 414 F.2d at 1115–1116. We may, of course, notice these materials judicially. Craemer v. Washington, 168 U.S. 124, 129, 18 S.Ct. 1, 42 L.Ed. 407 (1898); Butler v. Eaton, 141 U.S. 240, 243–244, 11 S.Ct. 985, 35 L.Ed. 713 (1891); Zahn v. Transamerica Corp., 162 F.2d 36, 48 (3d Cir. 1947).

51. The practice had its origin in a conference between the police and the office of the Corporation Counsel in 1954, two years before enactment of the Narcotic Vagrancy Act. Metropolitan Police Department, Memorandum Order No. 23, Series 1954 (March 23, 1954). At the conference, as the memorandum states, "this Department was advised as to what evidence was needed to successfully prosecute various types of vagrancy cases" under the general vagrancy law. The memorandum admonished that "[a] number of observations must be made in each type of case, varying according to the section of the Vagrancy Law under which the person is to be charged." Commanding officers were directed to require members of the force under their commands to comply with instructions set forth in the memorandum "in making observations and obtaining evidence necessary to prosecute the various types of vagrancy cases" outlined therein.

52. See Gomez v. Layton, *supra* note 10, 129 U.S.App.D.C. at 290–291, 394 F.2d at 765–766; *Ricks I, supra* note 3, 134 U.S.App.D.C. at 202–203, 414 F.2d at 1098–1099; *Ricks II, supra* note 4, 134 U.S.App.D.C. at 216–217, 414 F.2d at 1112–1113; Gomez v. Wilson, *supra* note 47, 139 U.S.App.D.C. at 125–126, 430 F.2d at 497–498.

53. See note 12, *supra.*

54. See, *e. g., Ricks II, supra* note 4, 134 U.S.App.D.C. at 216–217, 414 F.2d at 1112–1113; Gomez v. Layton, *supra* note 10, 129 U.S.App.D.C. at 290, 394 F.2d at 765.

55. See *Ricks I, supra* note 3, 134 U.S.App. D.C. at 203, 414 F.2d at 1099.

56. *Ricks II, supra* note 4, 134 U.S.App. D.C. at 219, 414 F.2d at 1115.

57. *Id.* at 220, 414 F.2d at 1116.

58. *Id.* at 219, 414 F.2d at 1115. The officer explained that "the basis for that suspicion" was that "she's a known prostitute" and that the officer twice saw her leave a carryout with men only to return within a short time. As the officer admitted, these circumstances gener-

apparently, for lack of any other explanation, it was for similar observations of Manuel Gomez,[59] Lloyd Hall,[60] and doubtless many others as well.

As we found out in *Ricks II*, "[a] vagrancy conviction is precipitated by the police record accumulated from vagrancy observations, and the observations enable the building of that record on suspicion alone."[61] That statement describes vagrancy arrests with equal accuracy. Our *Ricks I* appellant was arrested as a vagrant when for lack of evidence an officer "could not make a proper arrest or a proper prosecution on grounds of prostitution."[62] A vagrancy arrest, said another officer, was used as an alternative where "[t]hat person might be a real smooth operator and I might not be able to catch them doing these other things."[63]

Such arrests, moreover, were not limited to those suspected of past criminality, but extended also to those "who might commit a crime in the near future."[64] "[V]agrancy," we were told, "is used to get undesirables off the street."[65] Addicts, said the trial prosecutor in *Ricks II*, "are . . . in a position where from their way of life

is a real danger that they will commit some other crime, not this particular crime [narcotic vagrancy], but some other crime."[66] And in *Ricks I*, the Corporation Counsel's chief prosecutor maintained that "you certainly don't have to wait until a person goes in and engages in the act of prostitution before you can see fit to arrest that person for being a vagrant."[67]

We need not consider whether Subsection (C) might have been ameliorated by timely executive construction removing its propensity for breeding arrests on suspicion. The data available to us indicate that implementation of the District's vagrancy laws has been left to the police department without mollifying regulations, and with one possible exception without any guidance whatever. That exception came in a conference in 1954 between police and the office of the Corporation Counsel during which procedures for developing evidence for use in general vagrancy prosecutions were considered.[68] From the recommendations then made to the police evolved the practice of vagrancy observations with warnings, a practice that not only failed to confine vagrancy administration with-

---

ated no ground for a prostitution arrest, but they "did justify . . . making an observation on her as a vagrant;" and that "the reason she was singled out from among the other people on the street derives from the fact that [the officer] had suspicions of her regarding illegal conduct that [he] did not have regarding other people on the street." *Id.* at 219, 414 F.2d at 1115.

59. See Gomez v. Layton, *supra* note 10, 129 U.S.App.D.C. at 290–291, 394 F.2d at 765–766.

60. See text *infra* following note 69.

61. 134 U.S.App.D.C. at 219, 414 F.2d at 1115.

62. 134 U.S.App.D.C. at 211, 414 F.2d at 1107. The other arresting officer testified that Miss Ricks was leading an immoral life because "I believe she is currently soliciting prostitution," but, since "all the elements of soliciting prostitution were not there," acknowledged that he "could not prove it." *Id.* at 212, 414 F.2d at 1108.

63. *Id.* at 212 n. 68, 414 F.2d at 1108 n. 68.

64. *Id.* at 213, 414 F.2d at 1109. "A vagrant is a probable criminal; and the purpose of the [general vagrancy] statute is to prevent crimes which may likely flow from his mode of life." District of Columbia v. Hunt, *supra* note 41, 82 U.S. App.D.C. at 161, 163 F.2d at 835 (footnote omitted).

65. *Ricks I*, *supra* note 3, 134 U.S.App.D.C. at 212 n. 67, 414 F.2d at 1108 n. 67.

66. *Ricks II*, *supra* note 4, 134 U.S.App. D.C. at 220, 414 F.2d at 1116.

67. *Ricks I*, *supra* note 3, 134 U.S.App.D.C. at 213, 414 F.2d at 1109.

68. See note 51, *supra.* As stated, this practice originated in an endeavor to build evidence for prosecutions under the District's general vagrancy statute, D.C.Code § 22–3302 (1967), and came into being two years prior to enactment of the Narcotic Vagrancy Act.

in constitutionally acceptable bounds but actively threatened the constitutional freedom of citizens to pursue legitimate business and associations without fear of groundless arrest.

Subsection (C) is constitutionally a misfit, in terms of the Fourth Amendment as well as the Fifth. The offense it prescribes is spurious; it has made its real contribution to arrests on suspicion. It plainly "authorize[s] police conduct which trenches upon Fourth Amendment rights" [69] and, in our view, the conduct in its name challenged on this appeal did exactly that. Police officers observed appellant three times on the street standing or walking with alleged drug users. On this, and nothing more, they arrested him and subjected him to a search.

■ We recognize, of course, that "[a] policeman has a duty to investigate suspicious circumstances, and [that] the circumstances of a person wandering the streets late at night without apparent lawful business may often present the occasion for police inquiry." [70] This appeal has not, however, presented an occasion for consideration of vagrancy observations per se, or the stopping and questioning they historically have involved.[71] What, instead, is inescapably in issue is appellant's vagrancy arrest and the related search, and we have addressed only these aspects of the case. For suspicious circumstances which may justify a "stop and question" do not support an arrest unless they ascend to the level of probable cause—within the Fourth Amendment meaning [72] rather than the statutory definition [73]—and upon the validity of appellant's arrest the attendant search wholly depends.[74] We hold that probable cause for the arrest was not made out simply by conduct ostensibly within the purview of Subsection (C),[75] and that appellant, as the victim of a search based upon such an arrest, could properly complain of a deprivation of Fourth Amendment rights by his timely motion to suppress the fruits of that search.[76]

69. Sibron v. New York, *supra* note 27, 392 U.S. at 61, 88 S.Ct. at 1902.

70. Palmer v. City of Euclid, *supra* note 16, 402 U.S. at 546, 91 S.Ct. at 1565 (concurring opinion). See also Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Dorsey v. United States, 125 U.S.App.D.C. 355, 357–358, 372 F.2d 928, 930–931 (1967).

71. Compare Gomez v. Wilson, *supra* note 47.

72. *E. g.,* Sibron v. New York, *supra* note 27, 392 U.S. at 62, 88 S.Ct. 1889.

73. See note 13, *supra.*

74. It has not been argued that the search was a protective one for weapons. See Terry v. Ohio, *supra* note 70, 392 U.S. at 20–27, 88 S.Ct. 1868. Nor has there been an effort "to point to particular facts from which" the arresting officers "reasonably inferred" that appellant "was armed and dangerous." Sibron v. New York, *supra* note 27, 392 U.S. at 64, 88 S.Ct. at 1903. And "[t]he suspect's mere act of talking with a number of known narcotics addicts over an eight-hour period no more gives rise to reasonable fear of life or limb on the part of the police officer than it justifies an arrest for committing a crime." *Id.*

75. There is no contention, nor does the record suggest, that there was probable cause for believing any legal violation on appellant's part other than a possible clash with Subsection (C). "There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs." Terry v. Ohio, *supra* note 70, 392 U.S. at 22–23, 88 S.Ct. at 1881. And "[t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." Sibron v. New York, *supra* note 27, 392 U.S. at 62, 88 S.Ct. at 1902.

76. Two other courts have suppressed evidence obtained in a search incident to an arrest under a statute later declared unconstitutionally vague. See United States v. Margeson, 259 F.Supp. 256, 267–271 (E.D.Pa.1966); People v. Beltrand, 63 Misc.2d 1041, 314 N.Y.S.2d 276, 284 (Crim.Ct.1970).

## V

Notwithstanding the constitutional infirmity in appellant's arrest and the incidental search, we remain confronted by the question whether exclusion of the arresting officers' testimony detailing the discovery of narcotics on appellant's person was required.[77] The doctrine barring evidence derived through means outlawed by the Fourth Amendment ministers to two special functions: "its major thrust is a deterrent one," [78] and it "also serves . . . 'the imperative of judicial integrity.'" [79] There is room for argument on both sides of an issue as to whether these purposes would be fostered by retroactive application of the exclusionary rule to seizures concomitant with Subsection (C) arrests when that provision was presumptively valid.

Nevertheless, the merits of the opposing arguments and the possible retroactive effect of our present ruling in other cases are matters we do not reach,[80] for in any event appellant has earned a reversal. He is the first litigant to prevail on a claim that the Fourth Amendment deficiencies of Subsection (C) nullify an arrest and search thereunder.[81] Our prior determination in *Ricks II* that Subsection (C) encounters Fifth Amendment difficulties foreclosing prosecution thereunder cannot obscure the fact that we now make a fresh constitutional determination on appellant's Fourth Amendment point. That is enough to enable him, along with any similarly situated future arrestees, to invoke it.

Parties establishing new constitutional precepts uniformly enjoy the gain therefrom [82] as "an unavoidable consequence of the necessity that constitutional adjudications [shall] not stand as mere dictum." [83] That is a conclusion compelled by "[s]ound policies of decision-making, rooted in the command of Article III of the Constitution that we resolve issues solely in concrete cases or controversies, and in the possible effect upon the incentive of counsel to advance contentions requiring a change in the law. . . ." [84] It is, too, a conclusion following as much in the Fourth Amendment area as in any other.[85] We think it clear that appellant must reap the benefit from the principle we announce

77. There is no contention that, aside from its incidence to the vagrancy arrest, the search could be validated. *Cf.* Chambers v. Maroney, 399 U.S. 42, 46–47, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

78. Terry v. Ohio, *supra* note 70, 392 U.S. at 12, 88 S.Ct. at 1875.

79. *Id.*

80. The question whether today's decision could be given retroactive application involves, of course, other considerations as well. See cases cited *infra* notes 82, 85.

81. See note 26, *supra.*

82. Compare Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), with Hill v. California, 401 U.S. 797, 802–804, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) ; United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), with Stovall v. Denno, 388 U.S. 293, 300, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) ; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), with Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) ; Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), with Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966). See also cases cited *Infra* note 85.

83. Stovall v. Denno, *supra* note 81, 388 U.S. at 301, 87 S.Ct. at 1972.

84. *Id.* See also Gaither v. United States, 134 U.S.App.D.C. 154, 178, 413 F.2d 1061, 1085 (1969), wherein we added: Lawyers are meant to serve their clients, and they cannot at the same time serve the growth of the law if they know that time spent and emphasis expended upon novel or potentially disruptive points of law are unlikely to advance their clients' interests.

85. Compare Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), with Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) ; Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), with Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

today whether others heretofore arrested do or not. That means, of course, that his conviction cannot stand.

The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

BAZELON, Chief Judge (concurring):

When this case was before the division, I voted to affirm the conviction. But I also stated that reversal would be required

if the statute, though purporting to define a substantive offense, were designed to "authorize police conduct which trenches upon Fourth Amendment rights," Sibron v. New York, 392 U.S. 40, 61 [88 S.Ct. 1889, 20 L.Ed.2d 917] (1968), or if in practice it had no other legitimate effect. The statute itself would then violate the Fourth Amendment, and the good faith or reasonable belief of the police would be irrelevant to the constitutionality of arrests or searches made under it. A good faith arrest for a "sham offense" stands on the same constitutional plane as a "sham arrest" under a valid statute. But our *Ricks* decision . . . did not hold that the narcotics vagrancy statute violates the Fourth Amendment, and the record in this case does not permit us to conclude that it does.

Judge ROBINSON's careful research and analysis have persuaded me that the narcotic vagrancy statute does indeed violate the Fourth Amendment. Accordingly, I join in Judge ROBINSON's excellent opinion for the Court and vote to reverse.

MacKINNON, Circuit Judge (dissenting):

The conclusion reached by the court in this case is premised on a holding that a provision of the District of Columbia Narcotic Vagrancy Act, D.C.Code § 33–416a(b) (1) (C) (1967), does not square with the court's construction of the Fourth Amendment. I find the path taken by the majority to arrive at this holding, and to reverse Hall's conviction, a curious one to say the least, and a mistaken one in several significant respects. My differences lead me to respectfully dissent from today's decision.

I

I would first disagree with the court's willingness to reach out and decide a novel and complex constitutional issue raised for the first time on this appeal. Before the District Court, appellant's only argument in support of his motion to suppress evidence was that the arresting officers had insufficient *factual* information to furnish probable cause to suspect that appellant was in violation of the Narcotics Vagrancy Act, the alleged violation for which he was originally arrested.[1] In the absence of probable cause, the arrest and accompanying search were argued to be illegal, and the narcotics revealed by the search therefore inadmissible in evidence.

In reversing appellant's conviction, the court relies on the same basic reasoning process, but substitutes a peculiar *legal* premise—the existence of which was first suggested on appeal—for the factual predicate asserted before the District Court as a basis for concluding that appellant's arrest was made without probable cause. The substituted legal premise is supplied by the court's holding that subsection (b) (1) (C) of the Narcotics Vagrancy Act violates the Fourth Amendment. The theory behind this holding is that the vagueness of the statutory definition of the substantive

---

1. Note 9 of the majority opinion refers to the claim in the written motion that the Fourth Amendment had been violated. However, the Fourth Amendment argument (Tr. 8, 124–131) was limited to a claim that the arresting officers did not

have sufficient facts to support a finding of probable cause for the arrest. At trial it was not contended that the Fourth Amendment was violated in any other manner.

crime of narcotic vagrancy is such as to necessarily lead to arrests, even entirely good faith arrests, based on "suspicion" alone. This amounts to a holding that what constitutes probable cause to support an arrest must be measured not only by the terms of the applicable statute, but also by independent limitations which purportedly inhere in the Fourth Amendment. In short, the court holds that subsection (b) (1) (C) establishes a measure of probable cause which is less than permissible under the Fourth Amendment, and that even though the arresting officers may have had probable cause to arrest as measured by the statute, they did not have probable cause as measured by the court's interpretation of the Fourth Amendment.

Traditionally, appellate courts have, under circumstances comparable to those of the present case, declined to consider arguments not presented to the court whose judgment is being reviewed. *See, e. g.,* Hutcheson v. United States, 369 U.S. 599, 82 S.Ct. 1005, 8 L.Ed.2d 137 (1962) (Harlan, J., joined by Justices Clark and Stewart); Worthy v. United States, 133 U.S.App.D.C. 188, 409 F.2d 1105 (1968); Sims v. United States, 132 U.S.App.D.C. 111, 405 F.2d 1381 (1968); Coor v. United States, 119 U.S.App.D.C. 259, 340 F.2d 784 (1964), cert. denied, 382 U.S. 1013, 86 S.Ct. 621, 15 L.Ed.2d 527 (1966); Lampe v. United States, 110 U.S.App.D.C. 69, 288 F.2d 881 (*en banc,* 1961), cert. denied, 368 U.S. 958, 82 S.Ct. 400, 7 L.Ed.2d 389 (1962). That rule, which restricts the assertion of new grounds on appeal, draws its support from important considerations derived from the nature of judicial review of lower court action. *See* Miller v. Avirom, 127 U.S.App.D.C. 367, 384 F.2d 319 (1967); Dart Drug Corp. v. Parke, Davis & Co., 120 U.S.App.D.C. 79, 344 F.2d 173 (1965). Although the rule may give way where there are "exceptional circumstances," United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936); *see also* Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941), there is little of an exceptional nature in the present case to call for avoiding the rule. To the contrary, there is much which strongly counsels in favor of applying the principle. I would have an end to the matter on that basis, and would affirm the judgment of the District Court.

## II

The first factor which suggests to me that the Fourth Amendment issue ought not even be reached in this case is the very fact that the issue *is* a constitutional one, and a novel and complex one at that. Federal courts do not sit "to decide abstract, hypothetical or contingent questions . . . or to decide any constitutional question in advance of the necessity for its decision. . . . ." Alabama State Federation of Labor, Local Union No. 103, United Broth. of Carpenters and Joiners of America v. McAdory, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945); *see generally* Rescue Army v. Municipal Court of Los Angeles, 331 U.S. 549, 568–575, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947). The wisdom of a reluctance to decide constitutional questions is perfectly demonstrated by this very case. As I will attempt to demonstrate, the court's holding opens up more troublesome questions than it purports to settle.

## III

As to the merits of the Fourth Amendment claim itself, while I would not even reach that question, I also wish to point out that the majority may well be *wrong* in its holding. The holding that subsection (b) (1) (C) violates the Fourth Amendment is practically indistinguishable, except in a purely doctrinal sense, from the holding in *Ricks II* that the very same subsection was so vague as to be invalid under the due process clause of the Fifth Amendment. Ricks v. United States, 134 U.S.App. D.C. 215, 414 F.2d 1111 (1968). Today's opinion for the court itself points up this very conclusion. Much of the court's

discussion leading up to the Fourth Amendment holding is devoted to criticisms of the Narcotics Vagrancy Act which duplicate the criticisms leveled against the Act in the *Ricks II* opinion. True it may be that the interests protected by the due process clause and by the Fourth Amendment may overlap somewhat, but to the extent that the Narcotics Vagrancy Act is constitutionally suspect the reason certainly lies much more comfortably within the due process clause than within the Fourth Amendment. This suggests to me that the Fourth Amendment may well not have the application contended for by the majority.

## IV

This close similarity between the rationale of the majority's Fourth Amendment finding and the *Ricks II* Fifth Amendment invalidation of subsection (b) (1) (C) suggests that the majority has, in effect, decided to retroactively apply the *Ricks II* finding here. Retroactive application of *Ricks II* would result in a determination that Hall's arrest under an unconstitutional statute was illegal, and that the evidence used to convict him here, obtained as a result of a search incident to that illegal arrest, should have been suppressed under the "fruit of the poisonous tree" branch of the exclusionary rule. *See* Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *cf.* Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

In its comprehensive review of retroactivity in Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), the Supreme Court has made it clear that retroactive application of *Ricks II* would be highly suspect:

Ever since Linkletter v. Walker, 381 U.S. 618, 629 [85 S.Ct. 1731, 1737, 14 L.Ed.2d 601] [1965], established that

"the Constitution neither prohibits nor requires retrospective effect" for decisions expounding new constitutional rules affecting criminal trials, the Court has viewed retroactivity or nonretroactivity of such decisions as a function of three considerations. As we most recently summarized them in Stovall v. Denno, 388 U.S. 293, 297 [87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199] [1967],

"The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

Foremost among these factors is the purpose to be served by the new constitutional rule. This criterion strongly supports prospectivity for a decision amplifying the evidentiary exclusionary rule. . . .

394 U.S. at 248–249, 89 S.Ct. at 1033. (footnotes omitted). The purposes to be served by excluding evidence improperly obtained have been repeatedly described as to deter lawless police conduct and to protect judicial integrity by ensuring that the courts "will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions." Terry v. Ohio, 392 U.S. 1, 12–13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1868); *see* Linkletter v. Walker, 381 U.S. 618, 629–635, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Mapp v. Ohio, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961); Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); Weeks v. United States, 232 U.S. 383, 391–393, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Retroactive application of the *Ricks II* decision would not assist the accomplishment of either of these purposes. At the time of Hall's arrest under the District of Columbia Nar-

cotic Vagrancy Act, on June 5, 1965, that statute had successfully resisted constitutional challenges in the local courts. Brooke v. United States, 208 A.2d 726 (D.C.Ct.App.1965); Jenkins v. United States, 146 A.2d 444 (D.C. Ct.App.1958). It cannot be said that arresting an individual for violation of a statute that has been judicially upheld constitutes "lawless" conduct, and it is difficult to imagine that the retroactive application of the *Ricks II* decision as a basis for excluding evidence obtained during a search incident to such an arrest would deter similar arrests or searches in any respect. As Chief Justice Warren pointed out in Terry v. Ohio, *supra:* "[R]igid and unthinking application of the exclusionary rule, in futile protest against practices which it can never be used effectively to control, may exact a high toll in human injury and frustration of efforts to prevent crime." 392 U.S. at 15, 88 S.Ct. at 1876.

The second and third factors considered to govern the retroactivity of a decision—the reliance of law enforcement officials on the old standards, and the effect on the administration of justice of a retroactive application—also weigh heavily against applying *Ricks II* retroactively. The importance to effective law enforcement of the ability to rely on judicial determinations of the constitutionality of statutes being enforced seems beyond question. Any suggestion as to the effect on the administration of justice would be wholly speculative, but our inability to speak confidently on this question is vitiated by Mr. Justice Stewart's observation in *Desist* "that we have relied heavily on the factors of the extent of reliance and consequent burden on the administration of justice *only* when the purpose of the rule in question did not clearly favor either retroactivity or prospectivity." 394 U.S. at 251, 89 S.Ct. at 1035 (emphasis added). Here, as in *Desist,* the deterrent purpose of excluding this evidence would not be served by retroactive application of *Ricks II* beyond its December 23, 1968 decision date.

Faced with this insurmountable obstacle to retroactive application of *Ricks II* to invalidate the search that produced the evidence upon which Hall's conviction was based, the majority has embarked on its strained and novel Fourth Amendment invalidation of this previously invalid statute in order to provide relief to this appellant under the doctrine of Stovall v. Denno, *supra,* (see majority opinion at 840–841). The result is that the court's decision today overturns no statute not already declared to be invalid, reverses no conviction as a necessary consequence of the actual principle announced, and does not necessarily contain the seeds for ever overturning any statute or reversing any conviction in the future. I would suggest that today's decision truly stands as a mere dictum and in practical effect is nothing more than a retroactive application of *Ricks II* contrary to all the rules and reasons for retroactivity.

I respectfully dissent from the court's decision and Judges TAMM and ROBB join herein. I also concur in the reasoning outlined in Judge ROBB's separate dissent.

ROBB, Circuit Judge (dissenting):

The appellant was arrested June 5, 1965 for violation of the District of Columbia Narcotics Vagrancy Law, 33 D.C.Code § 416a (1967). A search pursuant to the arrest disclosed 56 capsules of heroin in the appellant's pocket. He was indicted for violation of the federal narcotics laws and on October 11, 1966 was convicted. On December 23, 1968, 3½ years after the arrest and search, this court held the narcotics vagrancy law unconstitutional. Ricks v. United States, 134 U.S.App.D.C. 215, 414 F.2d 1111 (1968).

There is no doubt that the facts known to the police gave them probable cause to arrest the appellant under the District of Columbia narcotics vagrancy statute. The search was incident to the arrest. All this is conceded. Yet, because the

narcotics vagrancy law was later declared unconstitutional, the majority concludes that the search was unreasonable and therefore invalid. I cannot agree.

The police acted reasonably and in good faith to enforce a statute that had several times been sustained by the District of Columbia courts. *See* Brooke v. United States, 208 A.2d 726, 728 (D.C. App.1965); Harris v. United States, 162 A.2d 503, 505 (D.C.Mun.App.1960); Jenkins v. United States, 146 A.2d 444, 447 (D.C.Mun.App.1958).[1] Certainly they could not be charged with predicting the future decisions of this court. *See* Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Nevertheless the majority invalidates their action, converting a reasonable search to an unreasonable one by making the decision in the *Ricks* case retroactive.

In a recent and closely analogous case the Supreme Court declined to apply a constitutional decision retroactively so as to invalidate a search and seizure. Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971). In 1967 Williams was arrested and a quantity of heroin was discovered and seized in the course of a search incident to the arrest. The trial court sustained the search, the heroin was introduced in evidence, and Williams was convicted and sentenced. The search was valid under the law evidenced by United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950) and Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). Those decisions, however, were disapproved by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, decided in 1969; and Williams argued that under the standards of the *Chimel* case the search was unreasonable. The Supreme Court held that the *Chimel* decision was not retroactive, and the judgment of conviction was affirmed. I think our *Ricks* decision should likewise be nonretroactive. I see

no difference in principle between a decision invalidating standards previously established by the Supreme Court and a decision invalidating rules established by Congress.

In holding that the *Chimel* standard was not retroactive the Supreme Court observed that Williams was "duly convicted when judged by the then-existing law", Williams v. United States, 401 U.S. 646, 656, 91 S.Ct. 1148, 1154, 28 L.Ed.2d 388 (1971), and that the new doctrine raised no question about his guilt or about the relevancy or probative effect of illegally seized evidence. These circumstances, the Court said, distinguished the *Williams* case from those in which a new constitutional doctrine is given retroactive effect because its purpose "is to overcome an aspect of the criminal trial which substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials", 401 U.S. 646, 653, 91 S.Ct. 1148, 1152 (1971). These observations I think are pertinent to the appellant Hall's case. There is no doubt of his guilt under the federal narcotics laws. Moreover, he was not arrested on suspicion or on a pretext, but for conduct that plainly violated the narcotics vagrancy law; the police were not at fault in any way. The discussion by the majority of possible unreasonable and improper police applications of the narcotics vagrancy law is therefore beside the point. *Cf.* United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1968).

In short, I think the search of the appellant was reasonable when made and is reasonable still.

For these reasons, as well as for those expressed in Judge MacKINNON's dissenting opinion, in which I concur, I respectfully dissent. I am authorized to say that Judges TAMM and MacKINNON concur in this dissent.

1. *See also* United States v. McClough, 263 A.2d 48, 55 (D.C.App.1970); Wilson v. United States, 212 A.2d 805 (D.C.App. 1965), rev'd on other grounds, 125 U.S. App.D.C. 87, 366 F.2d 666 (1966); Rucker v. United States, 212 A.2d 766 (D.C.App.1965).